**GOVERNMENT OF ARUBA, Plaintiff,**

v.

**Rafael A. SANCHEZ, Motorsports Americas, Inc., and Sanchez Motorsports Group, Inc., Defendants.**

**Motorsports Americas, Inc. and Sanchez Motorsports Group, Inc., Counter–Plaintiffs,**

v.

**Government Of Aruba, Counter–Defendant.**

**No. 01–830–CIV.**

United States District Court, S.D. Florida, Miami Division.

Aug. 9, 2002.

Ronald Ravikoff, Esq., Peter Kolker, Esq., Richard C. Seavey, Esq., Zuckerman Spaeder LLP, Miami, FL, for Plaintiff.

Roberto Martinez, Esq., Dean Colson, Esq., Marc Cooper, Esq., Susan Tarbe, Esq., Colson Hicks Eidson, Coral Gables, FL, for Defendants.

### *FINDINGS OF FACT AND CONCLUSIONS OF LAW*

JAMES LAWRENCE KING, District Judge.

### I. *Parties, Jurisdiction and Venue*

1. Aruba is a foreign state as defined in 28 U.S.C. § 1603, located in the southern Caribbean approximately 12 miles off the coast of Venezuela. It has a population of about 100,000 people, who acquired separate political independence within the Kingdom of the Netherlands in 1986. The Government of Aruba ("GOA") has a parliamentary system of government, consisting of 21 elected representatives and seven Ministers. Parliament appoints the government, or Ministers, to govern the coun-

try. Between 1999 and 2000, when the events in dispute in this case occurred, there were seven Ministers. Prime Minister Hendrik Eman ("Henny Eman" or "Prime Minister Eman") was the Prime Minister of Aruba during that period. The Prime Minister is responsible for coordinating the execution of the government's programs.

2. Robertico Croes ("Tico Croes") was the Minister of Finance of Aruba during the events at issue in this litigation, responsible for overseeing and protecting the national treasury. Minister Gilberto F. Croes, Jr. ("Junior Croes") was the Minister of Transportation, Communications and Sports in Aruba during the period 1998—December 31, 1999. Mr. Mike de Meza was appointed by the GOA Council of Ministers as its authorized representative to the racetrack project at issue in this case. Senator Glenbert Croes was the head of the OLA party, the minority party in the coalition which ran the government, and at various times the Vice Prime Minister of Aruba and a member of Parliament.

3. Defendant Ralph Sanchez has an international reputation as a developer of automobile racetrack projects and promoter of professional motor car sport events. Designing, building and creating racetracks and promoting professional motor sport events, has been his principal business for over 20 years. He created the concept, obtained the approval from governmental agencies and the sanctioning bodies governing professional race car events and conducted, commencing in 1981, Grand Prix Racing on the streets of Miami for the ensuing 15 years. He is responsible for creating, designing and building the Homestead Speedway in South Florida. It opened in 1999 and operates on a 2.1 mile track, situated in

360 acres, with permanent seating for 36,-000 spectators and an additional 18,000 temporary spectator accommodations. This is internationally recognized as one of the finest motor sport racing facilities in existence. The Defendant Sanchez pioneered the idea of broadcasting, to over 120 countries, the race car sporting events that he promoted. His racing events have been televised throughout the United States and to Latin America.

4. The Defendant's involvement with these racing events has been extremely successful with positive economic impacts for those communities in areas where he has been personally involved, built race tracks and conducted races. The Government of Aruba aggressively solicited the involvement of Ralph Sanchez to develop a race track on the island of Aruba for the purpose of developing or bringing the same type of positive economic impact to Aruba that Mr. Sanchez had brought to South Florida with the development of the Homestead Speedway project.

5. To implement the construction of the Aruban race track project, Mr. Sanchez created two corporations, which are Defendants and Counter–Plaintiffs in this case: Sanchez Motorsports Group ["SMG"] and Motorsports America, Inc. ["MAI"]. Both corporations have their principal place of business in Miami–Dade County, Florida with Defendant Sanchez occupying the positions of President and Chief Executive Officer of each.

6. Senator Glenbert Croes, leader of the OLA coalition in the Aruban Parliament, a strong supporter of the race track project, testified "Mr. Sanchez' involvement in the project was critical because there was no one else known to the Government with Mr. Sanchez' experience and knowledge in the motorsports industry.

The Government of Aruba hoped that it could leverage Mr. Sanchez' reputation to bring United States based racing series events to Aruba. The participation of the United States racing series in such a venture was critical to its success. It was also clear that no one in Aruba had the expertise to develop or manage such a project on their own."

7. Despite the best efforts of a great number of people on all sides of this case, the Aruban race track was not constructed. Multiple issues involving determination of the responsibility for the failure of the project and the subsequent damage flowing therefrom, were tried non-jury, to this Court between May 20th and June 7th, 2002. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332 and pursuant to 28 U.S.C. §§ 1330 and 1607. Venue lies in the Southern District of Florida pursuant to 28 U.S.C. § 1391.

## II. *Findings of Fact*

8. In February of 1999, Ralph Sanchez received a phone call from Mr. Carlo Mansur, a prominent wealthy Aruban businessman and developer who invited Mr. Sanchez to come to Aruba for the purpose of discussing his plan to built a go-cart race track on the island. Mr. Sanchez had never met nor spoken with Mr. Mansur before receiving his call about building a race track and his last visit to the island was 15 years prior to the phone call.

9. Mr. Mansur is a 33–year–old chief financial officer of the Rubin Mansur Holding Company, a family-owned extensive business entity involved in a substantial number of shipping, importing, construction and development interests in Aruba. He is chairman of the Aruba Airport Authority, supervising and operating the international airport in Aruba. The airport was built in cooperation with the Government of Aruba and involved a $90 million dollar bond issue for the airport. Replying to Mr. Mansur's inquiry as to whether or not Mr. Sanchez would be interested in helping develop such a project, the Defendant replied that he was not interested. A week later, Mr. Sanchez got another call from Mr. Mansur and was asked if he would be willing to help to built a full-scale, championship–type international race track. Mr. Mansur represented his role to be that of developer and builder of the project in cooperation with the GOA; with the Defendant's role to be an advisor, consultant, designer of the track and responsible for getting the sanctioning agreements to bring the professional race track drivers and racing organization to conduct races when the track was built. Mansur would be responsible for financing the project and would own the track when completed. Sanchez was to be a service provider. Mr. Mansur was the one who was in contact with the government officials who were promoting the idea of developing a race track to help the Aruban economy.

10. Thereafter, in March 1999, officials of the GOA, Gilberto F. Croes, Jr., the GOA's then Minister of Transport, Communications, Utilities and Sports ("Minister Junior Croes"), Franklin Abath, the Director of the Government Land Administration ("Domeinbeheer"), and Elton Liue–A–Tjam, Director of the Department of Land Use and Environment ("VROM"), traveled to Miami–Dade County, Florida to visit the Homestead Motor Speedway located in Homestead, Florida, and meet its developer, Ralph Sanchez. The purpose of the visit was to obtain an understanding as to how the development of a professional motorsports facility could benefit the

country of Aruba. During their visit, the GOA officials became very impressed with the significant positive economic impact the Homestead facility had brought to the Homestead area after it was devastated by Hurricane Andrew in 1992, and felt that such a project could have a positive impact in the country of Aruba.

11. Mr. Sanchez' reputation was important to the GOA officials because they wanted to be certain they were dealing with knowledgeable and experienced members of the motorsports industry if the GOA were to develop a motorsports project. After meeting with him and his staff, and reviewing the track at Homestead, the GOA officials expressed themselves as being very impressed with Mr. Sanchez' excellent reputation in the motorsports industry. Mr. Sanchez has been one of the most respected and successful promoters and organizers of professional motorsports events for over the past 20 years. As noted above, he has been, among others, the co-founder of the Indy Lights series in the 1980's and the developer of the Homestead Motorsports Speedway, a motorsports facility considered to be one of the finest in the world. Approximately eighteen years ago Mr. Sanchez created the Miami Grand Prix race, then held in downtown Miami, which grew to be a major international Grand Prix race.

12. Mr. Sanchez was interested in the GOA's proposal for a racetrack in Aruba, since he had already been involved in developing a racing series in Latin America and the Caribbean. Mr. Sanchez, through SMG, one of his companies, had the year before signed an agreement (Def.Ex.221) with SCCA, one of the United States motorsports sanctioning bodies, with respect to a license to sanction races in Latin America and the Caribbean.

13. After the visit from GOA officials in March 1999, Mr. Sanchez began to evaluate the economic feasibility and the substantial problems of design, construction and racing organization approvals inherent to such a project. In April, 1999, he traveled to Aruba with Mr. Jim Mock, the engineer with the architectural and engineering firm of Bermello, Ajamil & Partners, the firm with whom he had worked on the Homestead Motor Speedway, to look at possible sites in Aruba. Minister Junior Croes drove Mr. Sanchez all over the island and arranged a helicopter viewing of possible sites for the track location for Defendant, Senator Glenbert Croes and others. As a result of that visit, he determined that the best site was at Tierra del Sol, which was on the N.W. corner of Aruba, near the heavy developed tourist-hotel beach area. This area, unlike the poorly developed San Nicolas area, has a plentiful supply of recirculated, purified water from the vast number of hotels adjacent to a beautiful championship golf course. The infrastructure; good roads and a reliably available source of electricity were already in place in this site adjacent to the California Lighthouse. (Def.Ex.1).

14. On April 30, 1999, Mr. Sanchez also signed a more detailed agreement with SCCA (Def.Ex.225), in which SCCA agreed to work in conjunction with MAI and SMG in promoting and sanctioning racing events in Latin America, the Caribbean and Aruba. For the Aruba racetrack project, Mr. Sanchez made a total of 53 trips to various cities in the United States and the Caribbean, including 17 trips to Aruba.

15. On May 20, 1999, Prime Minister Eman and Minister Junior Croes traveled to Miami–Dade County, Florida, on a trip

arranged by Minister Junior Croes to personally inspect the Homestead Motorsports Speedway and for further meetings with Mr. Sanchez.

16. On the following day, after having visited the Homestead Motorsports Speedway, a meeting was held at the Ocean Reef Club in Key Largo, Florida, attended by Prime Minister Eman, Minister Junior Croes, Ms. Alice Von Romondt, the permanent secretary to the Council of Ministers of the GOA, Mr. Sanchez and Peter J. Yanowitch, legal counsel for Mr. Sanchez, MAI and SMG. At that meeting Prime Minister Eman solicited the involvement of Mr. Sanchez to develop a motorsports racetrack with world-class auto racing in the country of Aruba. The representatives of the Government of Aruba were enthusiastic over seeing the Miami Grand Prix races being run during their visit to Homestead and the tremendous potential of the project for Aruba. Prime Minister Eman described the country of Aruba as a politically stable country with an extensive tourism industry, and as a perfect location for a new motorsports race track facility. The Prime Minister Eman told the group that the GOA did not have anyone who had any experience with projects of this nature or with the ability to undertake such a large-scale and important project without the participation and assistance of an established racing promoter with expertise in the motorsports industry, such as Mr. Sanchez and his companies, SMG and MAI.

17. During the meeting Prime Minister Eman stated that he wanted the racetrack built in the San Nicolas area of Aruba, a sparsely developed part of the island, away from the tourist impacted, heavily developed hotel area. Prime Minister Eman explained that the GOA viewed the race track project as very important because of the economic benefit it would bring to the poor people of the San Nicolas area. The Prime Minister described the San Nicolas area as underdeveloped economically and lacking a key economic engine to bring prosperity to the area. He explained that he wanted to fulfill a promise he had made in the previous election to the people of San Nicolas to bring a major economic development project to their area. Prime Minister Eman acknowledged the difficulties of developing such a large scale project in San Nicolas but promised that the GOA was prepared to commit more financial support for the investors in a project developed in San Nicolas, than if the project were located in the more developed areas of the island. Prime Minister Eman assured Mr. Sanchez that the GOA was fully committed to provide the necessary financial support to develop the race track project if Mr. Sanchez, SMG and MAI agreed to take part in a business venture to develop the motorsports facility and locate it in San Nicolas. At no point during the meeting did Prime Minister Eman indicate that the GOA would establish any preconditions for the financial support to be extended, other than for Mr. Sanchez to commit to bring motorsports races to the facility.

18. Prime Minister Eman further told Mr. Sanchez that if he would agree to become involved in the project and locate the race track in San Nicolas, the GOA would, among other things, provide the necessary land for the project at little or no cost and provide tax holidays and other economic incentives.

19. The parties discussed the Prime Minister's concern over whether Aruba could persuade the United States motorsports sanctioning organizations to sanction

races in Aruba. Mr. Sanchez explained that the sanctioning organizations would be reluctant to agree in advance to sanction races at a racetrack which had not yet been built, but that he would, as part of his undertaking, agree to secure those sanctions and racing dates from the sanctioning organizations.

20. Mr. Sanchez expressed concern about his fees and how they would secured, especially since there was a possibility of a change in the government through upcoming elections. He told Prime Minister Eman and Minister Junior Croes that he would want his fees guaranteed. Prime Minister Eman and Minister Junior Croes agreed that Mr. Sanchez was entitled to assurances in this regard. However, Minister Junior Croes explained that they could not use the word "guarantee," because the use of this term was politically sensitive in Aruba. Prime Minister Eman explained that they could reach the same result through the use of a "letter of comfort," a term new to Mr. Sanchez. The Prime Minister said "in order for us to give you a guarantee, we will have to go through Parliament and it will be a nightmare. How about a letter of comfort?" He went on to explain that a letter of comfort was like a bank check—you get the money in 30 days.

21. Following this meeting, Mr. Sanchez started contacting various United States sanctioning organizations, including CART, American Le Mans, and SCCA, to determine whether they might be interested in working with Mr. Sanchez and his companies to sanction races in Aruba. He also started to put together his staff, which consisted of numerous people who had worked with him on the Miami Grand Prix and the Homestead Motorsports Speedway, as well as the team of architects and engineers who would be necessary for the project. In early June, he traveled to Aruba with the architect, Willy Bermello, the principal of Bermello, Ajamil & Partners, and with engineer Jim Mock. They went to the San Nicolas area and looked at possible sites for the racetrack. They also met with various government officials, including Minister Junior Croes and Senator Glenbert Croes, to discuss the land and tax holidays they would need to receive from the GOA. Minister Junior Croes assured them that none of these issues were a problem.

### The Letter of Intent

22. On June 30, 1999, a meeting was held in Aruba relating to the project. This meeting was attended by Mr. Sanchez, representing MAI and SMG, the GOA, represented by various GOA officials, Westland Properties, Inc. ("WEST"), the Aruban company serving as the local developer and promoter of the project and headed by Mr. Carlo R. Mansur, the construction contractor Calmaquip/Albo ("JVC"), which had recently completed the construction of Aruba's new international airport facility, represented by Raul Gutierrez and Henk Bijan, and the construction architect B & A Latin America, Inc. ("BAL"), a subsidiary of Bermello, Ajamil & Partners, represented by Mr. Bermello, which had designed the Homestead Motorsports Speedway, (collectively "the Project Partners").

23. Before the meeting the discussions between Mr. Sanchez and the GOA recognized that Mr. Sanchez and his companies would be service providers, not investors in the project. Their role would be to obtain sanctioning agreements and racing dates from the United States sanctioning organizations, to work on the design and construction of the racetrack, to get the

sanctioning organization's approval to that design, and to provide the expertise necessary to actually run the races at the racetrack. All parties understood that the role of Mr. Sanchez and his companies in the design and construction of the racetrack was important. The sanctioning organizations had to approve every aspect of that design and construction because the lives of the drivers and those on the track was at stake. Mr. Sanchez' expertise and his relationship with the sanctioning organizations would facilitate and assure that approval. The GOA's role would be to provide the necessary financial incentives and support for the project. The Mansur family, a wealthy Aruban family, would be the project's developer.

24. However, at the June 30, 1999 meeting Prime Minister Eman shifted the GOA's approach to the project and demanded a new approach whereby each of the participants, including the GOA, would become a shareholder in a company to be formed by parties to develop and operate the motorsports facility. The Prime Minister explained that this approach had been used to develop the Hyatt Hotel in Aruba, in which all parties would share the risk in the venture by becoming shareholders and joint venture partners in a corporation and providing the funding for the corporation. He therefore referred to it as the "Hyatt model." Minister of Finance Tico Croes explained that this approach, in which the GOA became a shareholder in the company, made the project stronger because the GOA would never permit any company in which it invested to "go under." Initially, Mr. Sanchez objected to this change. The Prime Minister said that the GOA would invest $3 million in equity as a shareholder and told Mr. Sanchez, and the architect and engineer to put up $1 million equity. Mr. Sanchez

testified that although he did not want to become an investor, away from Miami, he ultimately agreed that he would invest $1 million in equity. The architect and engineer objected, but ultimately agreed to contribute $500,000. Mr. Mansur owned 100% of the project at the beginning of the meeting and either 30 or 35% at the end. At the meeting, there was no discussion or agreement that any of these capital contributions were contingent or dependent on any proposed budget by Mr. Sanchez or his companies.

25. At the meeting, Mr. Sanchez explained that for the racetrack project to be feasible and viable, it would be necessary for him to sign agreements with the United States sanctioning organizations for more than one year. Mr. Sanchez explained that because the company to be formed to develop the project might not be able to meet its obligations to him for these sanctioning agreements after the first year, he needed assurance or support from the GOA that these obligations would be met. The GOA did not object to providing this support or assurance.

26. The next day, July 1, 1999, the parties met in the Council of Ministers meeting room to review a draft agreement which had been prepared overnight. The draft agreement did not contain any provision giving Mr. Sanchez or his companies the support or assurance which he required from the GOA for obligations after the first year. Mr. Sanchez and Mr. Mansur complained to Prime Minister Eman. Mr. Mansur told Prime Minister Eman that he and his family's companies would not participate in the project without that support or assurance by the GOA. Prime Minister Eman called Mr. Sanchez, Mr. Mansur and Finance Minister Croes into his private office. In that meeting, Prime

Minister Eman agreed to insert that provision in the draft agreement.

27. A new draft of the agreement, was prepared. It was signed by the Project Partners, including the GOA, on July 1, 1999. It is referred to as the "Letter of Intent" and is in evidence as Pl.Ex. 9 and Def.Ex. 107. The Letter of Intent was subsequently ratified at a meeting of the GOA's Council of Ministers.

28. The Letter of Intent provided for the formation of an Aruban company (initially named "ARUCO" and later changed to "Colorado Hills, N.V.") to develop and operate the motorsports facility ("the Aruba Motorsports Complex") and required each of the Project Partners to make respective capital contributions. The GOA and SMG were obligated to make capital contributions of $3,000,000 and $1,000,000, respectively. Under the Letter of Intent, these obligations were not contingent or dependent on any proposed budget by Mr. Sanchez or his companies. Mr. Carlo Mansur was appointed as the Managing Director of Colorado Hills, and therefore he had the primary responsibilities for running the company.

29. The Letter of Intent contemplated that MAI would negotiate with, and obtain from United States motorsports sanctioning bodies the rights to hold at least four major racing events at the Aruba Motorsports Complex, and that it would be paid approximately $4,250,000 a year for securing those commitments. The sanctioning bodies are organizations in the United States responsible for organizing the races, establishing safety and racing criteria, and awarding points and money to successful drivers. The Letter of Intent provided that ARUCO would secure a letter of credit for the benefit of MAI to secure the payments due to MAI, that this letter of credit would be for no more than $4,250,000 to secure the payments due to MAI during the first year of operation, and that thereafter this letter of credit would be "irrevocable and revolving from year to year." This language ("irrevocable and revolving from year to year") was the language which was inserted after the initial draft of the agreement was prepared; it was inserted to meet Mr. Sanchez's and Mr. Mansur's concern about support from the GOA after the first year. In the Letter of Intent; the GOA also committed to "provide whatever is necessary to assist ARUCO" in performing these obligations for the benefit of MAI.

30. The Letter of Intent further required the Project Partners to "negotiate and execute all further appropriate and necessary legal agreements in good faith." *Id. at ¶ 10.*

31. The Letter of Intent was not a complete or final agreement between the parties. Prime Minister Eman, Mr. Sanchez and Mr. Mansur have each testified that the Letter of Intent was not intended to be a complete or final agreement between the parties. (5/21 Tr.Trans. at 124–25). Prime Minister Eman testified that "I can think of ten other conditions" that were not in the letter of intent; (5/30 Tr.Trans. at 36). Mr. Sanchez testified: "This was just a letter of intent. . . . We intended to sign another agreement with more detail. That was how I received this agreement."; (6/3 Tr.Trans. at 67–68). Mr. Mansur testifies that "as a result of this document, further agreements and documents would be executed and put in place".

32. During the negotiations, both Prime Minister Eman and Minister Tico Croes assured Mr. Sanchez that the GOA was prepared to provide whatever financial

assurances were necessary to satisfy MAI's requirement that the GOA would back ARUCO's obligation to pay MAI's fees for securing the racing series rights. These assurances were consistent with the Letter of Intent, which provided that the GOA would "provide whatever is necessary to assist ARUCO" in guaranteeing its obligations to MAI. Prime Minister Eman promised Mr. Sanchez that the GOA would issue a "letter of comfort" assuring the payment of such fees to MAI by ARUCO. Without these assurances, Mr. Sanchez, SMG and MAI would not have participated further in the project. Finally, Prime Minister Eman asked Mr. Sanchez to move forward and finalize the details of the agreement between his companies and ARUCO (Colorado Hills) so that the racetrack would be ready for the 2000 racing season.

### The Letter of Comfort

33. During trial, Prime Minister Eman testified that he told Mr. Sanchez, on numerous occasions, that he would issue a letter of comfort supporting the project. (5/21 Tr.Trans. at 32). Plaintiff, GOA now takes the position that they never promised Mr. Sanchez or MAI a letter of comfort, which would assure Colorado Hills' obligations to MAI. Instead, the GOA contends that Prime Minister Eman only promised a letter of comfort which would indicate the GOA's support for the project.

The clear facts, from the testimony of competent and truthful witness, impel a factual finding to the contrary. Putting aside the testimony of the interested witnesses, Mr. Sanchez, who has a financial interest with respect to this issue, and Prime Minister Eman and Finance Minister Croes, who have a political and personal interest with respect to this issue; the Court finds persuasive the testimony of

Minister Junior Croes, the minister directly involved on the racetrack project, Mr. de Meza, the GOA's own representative to Colorado Hills, and Senator Glenbert Croes, a leader of Parliament. Each of these individuals testified that Prime Minister Eman promised Mr. Sanchez a letter of comfort which would assure Colorado Hills' financial obligations to MAI. The Court carefully observed the demeanor of each of these witnesses and finds them credible. Each person's testimony in this regard is contrary to their personal political interests and the interests of their country. For those reasons, the testimony of each is particularly persuasive.

34. In addition, even though Mr. Sanchez and his companies were never provided with the promised letter of comfort, Mr. Sanchez and his companies continued full support for the development of the project. When asked whether Mr. Sanchez kept working toward the development of the project during that time, Prime Minister Eman responded: "All of them did .... Everything was going forward to making that project become a reality in the following year." (5/21 Tr.Trans. at 205–06).

### The CMB Bank Guarantee

35. Shortly after execution of the Letter of Intent, Mr. Mansur undertook to fulfill ARUCO's obligation under the Letter of Intent to establish a letter of credit, for the benefit of MAI, to guarantee ARUCO's obligations to MAI for sanctioning fees. Mr. Mansur, who was appointed as the Managing Director of ARUCO by all the shareholders, including the GOA, applied to the Aruban Caribbean Mercantile Bank ("CMB") for this purpose. The Minister of Finance Tico Croes accompanied Mr. Mansur to the banks, supporting his efforts to obtain the money ($4.5 million) for the project. They were unsuc-

cessful in getting the essential letter of credit. (5/22 Tr.Trans. at 45). The bank refused to issue a letter of credit to ARUCO (Colorado Hills) unless GOA guaranteed the letter of credit and Mr. Mansur and his father providing US$1,000,000 in collateral. Mr. Mansur went to the GOA requesting a $3 million guarantee to obtain the $4.5 million letter of credit from the bank. He also called upon the ARUCO (Colorado Hills) shareholders to deposit further equity contributions. Pursuant to its obligation under the Letter of Intent to "provide whatever is necessary to assist ARUCO [Colorado Hills]," the GOA agreed to provide that guarantee through a $600,000 cash collateral pledge and through a "letter of comfort" to CMB.

36. On July 21, 1999, Peter J. Yanowich, the attorney representing MAI, sent a letter to Finance Minister Tico Croes, outlining the procedures which would be followed by MAI in drawing against the $4.5 million CMB letter of credit. (Pl. Ex.13, Def.Ex.108). Attached to the Yanowitch July 21, 1999 letter was a "projected budget" setting forth the anticipated amounts to be paid from the $4.5 million letter of credit. Prime Minister Eman never saw the July 21, 1999 letter or budget and did not speak to anyone about it. With respect to the "projected budget," he acknowledged that "I didn't really pay attention, not then and not before that." (5/21 Tr.Trans. at 133). The only GOA official who testified that he actually read the letter and budget was Finance Minister Tico Croes. He reviewed both the conditions set forth in the letter under which MAI would be entitled to draw funds from CMB and the "projected budget." The Plaintiff, GOA, relies heavily upon the testimony of Finance Minister Tico Croes wherein he states (5/22 Tr. Trans. at 71) that he relied upon the Ya-

nowitch letter and proposed budget (Pl. Ex.13) in providing, on behalf of the GOA, the $3 million guarantee to the Caribbean Mercantile Bank N.V. on July 22, 1999 (Pl.Ex.37C). This testimony is in clear contradiction to the sworn deposition testimony taken October 17, 2001 where he repeated several times, with reference to the Letter of Intent "I did not know what the Letter of Intent meant." He had no clear understanding of the conditions set forth in the letter under which MAI would be entitled to draw funds from CMB, and was unable to explain how those express conditions had anything to do with the "projected budget." Indeed, he conceded that the express conditions set forth in the letter under which MAI would be entitled to draw funds from CMB made no mention whatsoever of the "projected budget."

The Court is unable to determine why this "projected budget" was sent, since there is no reference to it in the Letter of Intent or in any of the documents relating to the CMB Bank Guarantee. The evidence is clear that the GOA did not rely on this July 21, 1999 (Yanowitch) letter or the "projected budget." At that point in the proceedings, the GOA was represented by American counsel Winston & Strawn, who advised Minister Tico Croes when he prepared the bank guarantee and the letter of comfort.

Given the fact that (1) Prime Minister Eman never saw (and therefore could never have relied upon) the Yanowitch letter and budget, and (2) the clear contradiction in the sworn testimony of Finance Minister Tico Croes where he repeatedly stated in his sworn deposition that he did not know what the provisions of the Letter of Intent and the bank guarantee meant, the Court concludes that his sworn testimony at trial that (a) he "relied" on the July 21

letter and budget in issuing the GOA's guarantee to the bank; and (b) that "MAI had not performed all of the conditions permitting it to draw upon the guaranteed funds posted at the Caribbean Mercantile Bank in Aruba" (5/22 Tr.Trans. at 151–86) is not credible. The Court therefore finds that the GOA and its primary officials acting for the government on this matter, the Prime Minister and Minister of Finance, did not rely upon the Yanowitch letter or the projected budget.

37. The credibility of Finance Minister Tico Croes was further placed in doubt when he testified that MAI had not performed all of the requirements in the Letter of Intent and other documents permitting the withdrawal of the $4.5 million bank guarantee (Counter-Pl.Ex.115) in that ". . . MAI had not performed the prerequisite requirements." (5/22 Tr.Trans. at 151–86). This testimony is simply not believable. The requirements were:

"I warrant and confirm to you that MAI will utilize the following procedures in drawing upon these guaranteed funds, which procedures I understand to be satisfactory to you:

With respect to those payments for the acquisition of events, MAI will forward to Aruco, N.V. an invoice and a letter of representation from the applicable United States sanctioning organizations which will provide the following representations: (i) MAI has concluded an agreement with the respective sanctioning organization; (ii) MAI has complied with the financial requirements under the licensing/sanctioning agreement to secure the race date; (iii) the United States sanctioning organization has guaranteed MAI the right to hold a race date on its calendar for the Fall/Winter of the 2000 race season; and (iii) MAI will invoice Aruco, N.V. for such expenses, and shall obtain approval of such invoices from the Managing Director of Aruco, N.V. (Which shall be paid in accordance with the MAI/Aruco, N.V. agreement) prior to submitting such invoices for payment from the guaranteed funds."

38. Clearly, MAI had performed each of the requirements set forth in (i), (ii), (iii) and (iii).

39. Recognizing that the GOA's obligation was to "provide whatever is necessary to assist ARUCO," Finance Minister Croes wrote to Mr. Mansur, on behalf of Aruba, on July 22, 1999, and detailed the conditions under which the GOA would issue a "letter of comfort" for the CMB letter of credit. (Pl.Ex.16, Def.Ex.114). None of those conditions had anything to do with the procedures set forth in Mr. Yanowitch's July 21, 1999 letter or the "projected budget" attached to that letter. None of those conditions had anything to do with the financial arrangements between MAI and the sanctioning organizations. With respect to MAI and the sanctioning organizations, the only concern evidenced by the GOA in this July 22, 1999 letter was that the GOA would issue its letter of comfort to CMB only if it had adequate assurance that MAI would obtain the sanctioning agreements that had been promised. As detailed below, MAI fully performed in that regard.

40. The conditions to the GOA's letter of comfort outlined in its July 22, 1999 letter were ultimately agreed to by Mr. Mansur, acting on behalf of ARUCO, when he countersigned that letter. The GOA never asked Mr. Sanchez or MAI to sign the July 22, 1999 or to agree to its provisions. Again, this is consistent with the fact that the GOA's obligation under the

Letter of Intent was to "provide whatever is necessary to assist ARUCO."

41. Significantly, the GOA's July 22, 1999 letter stated that its agreement to provide a letter of comfort to CMB would be in "complete satisfaction" of its obligations under Paragraph 5 of the Letter of Intent. The Letter of Intent, however, involved numerous parties, including Mr. Sanchez, MAI and SMG. The GOA, however, never sent the July 22, 1999 letter to the parties who had executed the Letter of Intent. The parties to the Letter of Intent, including Mr. Sanchez, MAI and SMG, never agreed that the GOA's letter of comfort to CMB would be in "complete satisfaction" of its obligation under Paragraph 5 of the Letter of Intent. Instead, the July 22, 1999 letter shows that the GOA attempted to unilaterally modify its obligations under the Letter of Intent.

42. On July 22, 1999, the GOA issued a "letter of comfort" to CMB. (Pl.Ex.206, Def.Ex.113). The letter of comfort provided that the GOA "will, without any reservations whatsoever, agree to any and all payments that Caribbean Mercantile Bank has to make or has made under aforementioned guarantee" up to US$3,000,000. The letter of comfort was signed by Prime Minister Eman and Finance Minister Croes.

43. On July 22, 1999, CMB informed Mr. Mansur, as Managing Director of ARUCO (Colorado Hills), in writing that it had approved ARUCO's (Colorado Hills') credit application for US$4,500,000. (Def.Ex.110). The letter made clear that Mr. Mansur and ARUCO (Colorado Hills) were both jointly and severally liable for the full amount of the loan. It also stated that the loan would be secured by a cash deposit by the GOA of Afl. 1,000,000 (approximately US$600,000); a bank guarantee of US$1,000,000 by Ruben Mansur, Mr. Mansur's father, and a guarantee by the GOA to CMB for US$3,000,000.

44. On July 23, 1999, CMB issued Bank Guarantee 965. (Pl.Ex.20, Def. Ex.115). ARUCO (Colorado Hills) was named as principal and MAI was named as beneficiary in that bank guarantee. The guarantee set forth certain conditions for payment to MAI. None of those conditions had anything to do with the "projected budget" attached to Mr. Yanowitch's July 21, 1999. Instead, payment under the guarantee was conditioned on the payment conditions set forth in Mr. Yanowitch's July 21, 1999 letter, i.e., (i) MAI concluding agreements with the respective sanctioning organizations; (ii) MAI has complied with all financial arrangements required by those sanctioning organizations; (iii) the sanctioning organizations have guaranteed racing dates for the Fall/Winter 2000 race season; (iv) MAI has submitted "an invoice for such expenses" to ARUCO, and (v) the Managing Director of ARUCO has approved those invoices. The GOA agreed to these conditions in its July 22, 1999 letter to ARUCO. (Pl.Ex. 16, Def.Ex. 114).

45. The GOA never required, as a condition to any payment to MAI under the CMB bank guarantee or the GOA letter of comfort to CMB, that it be provided with the sanctioning agreements between MAI and the sanctioning organizations or other financial agreements between MAI and those organizations. The GOA never required, as a condition to any payment to MAI under the CMB bank guarantee or the GOA letter of comfort to CMB, that it be provided with the agreement between MAI and ARUCO. Instead, the GOA only required that the MAI invoices be approved by Mr. Mansur, the Managing Di-

rector of ARUCO (Colorado Hills), which approval he gave to each invoice.

46. The parties ultimately decided to use the name "Colorado Hills" for the joint venture, rather than "ARUCO."

### The Colorado Hills Agreement

47. Historically, the professional motorsports sanctioning organizations have been reluctant to stage racing events in a foreign country such as Aruba because of the inability to find foreign promoters with experience in promoting races, because of the uncertainties in dealing with local governments and their politicians and because of language barriers. Moreover, some motorsports sanctioning organizations, had suffered negative experiences in the past, including financial losses, in undertaking agreements with promoters seeking to stage racing events at race tracks not yet built, because the race tracks were either never built, were not built on time or were not built according to their safety specifications.

48. Since Colorado Hills was unknown to the motorsports industry, located in a foreign country, and with a yet-to-be-built race track, all the participants in the project, including the GOA, knew that the motorsports sanctioning organizations would be unwilling to deal directly with Colorado Hills, but instead would only work with Mr. Sanchez and his companies. It was therefore necessary for Colorado Hills to enter into an agreement with MAI and SMG for this purpose. The parties envisioned this role for MAI and SMG in the Letter of Intent.

49. In reliance on the representations made by the GOA to Mr. Sanchez, MAI and SMG that it would issue a "letter of comfort" guaranteeing MAI's fees for the acquisition of the racing events, on July

29, 1999, SMG and MAI entered into the Aruba Motorsports Venture Letter Agreement with Colorado Hills, N.V ("The Colorado Hills Agreement"). (Pl.Ex.22, Def. Ex.182). A prior draft of the Colorado Hills Agreement, with essentially identical terms, was presented at the first shareholders' meeting of Colorado Hills on July 9, 1999, whose GOA attendees included, Mr. Mike de Meza, the representative of Minister Junior Croes, and Carlisle de Coteau, the representative of Finance Minister Tico Croes. The shareholders authorized Mr. Mansur to execute the agreement for Colorado Hills as its authorized representative and Managing Director. After it was executed, Mr. Mansur personally delivered a copy of the Colorado Hills Agreement to Finance Minister Croes and Minister Junior Croes. Copies of the Colorado Hills Agreement were filed in the official records of the Chief of Staff to the Minister of Finance (Def.Ex.183) and the Central Accounting Office of the Ministry of Finance. (Def.Ex.609).

50. The Colorado Hills Agreement set forth the terms under which Colorado Hills, SMG and MAI, agreed to proceed to design, develop, and operate the Aruba Motorsports Complex. The agreement was for an initial contract term of ten years, and automatically renewed for successive terms of ten years.

51. The Aruba Motorsports Complex was initially envisioned as a 2.7 miles, 14 turn road course, to be built to international safety standards, and scheduled for completion in September 2000.

52. The Colorado Hills Agreement provided MAI was to "act as the master sanctioning body for events held at the Aruba motorsports facility and sanctioned in conjunction with United States sanctioning

bodies. Such sanctioning bodies could include the Championship Auto Racing Teams ('CART'), Sports Car Club of America ('SCCA'), the American Motorcyclist Association ('AMA'), American Le-Mans Series ('ALS'), the Southern Vintage Racing Association ('SVRA'), and the National Hot Rod Association ('NHRA'), among others." As part of its responsibilities MAI was to be "exclusively ... responsible for interfacing with the various professional sanctioning bodies and for: (i) interpreting their requirements with respect to the design and construction of the Aruba motorsports facility; (ii) conducting negotiations with respect to the motorsports events to be held at the facility; and (iii) coordinating the operation of such events with the sanctioning bodies." In exchange for these services, MAI was to receive $4,500,000 per year, increasing 8.5% annually.

53. According to the Colorado Hills Agreement, SMG was to provide two separate services. It was to act as the consultant for the design and construction of the Aruba Motorsports Complex. It was also to act as a consultant in the promotion and operation of the Aruba Motorsports Complex. SMG's responsibilities in this regard including all phases of the racetrack's operation, including "booking of events; supervision of the racing and non-racing activities during event weekends; supervision of sales of food and beverage, corporate hospitality, signage and tickets, advertising, promotion and marketing of events." SMG was to receive from Colorado Hills $1,800,000 for fees and expenses for the project's development and thereafter $1,700,000 annually plus an additional $300,000 annually commencing in year two for transportation expenses.

**MAI Obtains Sanctioning Agreements And Seeks Payment**

54. Immediately after signing of the Letter of Intent on July 1, 1999, Mr. Sanchez undertook to fulfill MAI's obligation to the GOA and to Colorado Hills. He immediately started working on the design of the racetrack together with the architects and engineers in order to get the racetrack completed by November 2000. He worked together with the sanctioning organizations on this design so that they would ultimately approve it. He continued to work on assembling his staff. In August, he began putting together the television team and prepared for the international press conference to be held at the end of the following month.

55. In addition, Mr. Sanchez undertook to fulfill MAI's obligation with respect to negotiating and obtaining sanctioning agreements from the various United States sanctioning organizations and commitments from those various organizations for specific race dates to stage races in Aruba. He traveled to various locations in the United States for that purpose.

56. On July 27 and 28, 1999, Mr. Sanchez traveled to Aruba and met with Prime Minister Eman, Finance Minister Tico Croes and Carlo Mansur. Mr. Sanchez told them that he had been successful in obtaining oral agreements from some of the sanctioning organizations. He advised them, however, that at least two of the sanctioning organizations, SCCA and CART, were concerned about the fact that the proposed races were overseas; they did not want to have to sue a foreign government or local promoter to force them to live up to their agreements. Mr. Sanchez explained that he would be willing to guarantee performance to these organizations, not just for the first year of races, but for races beyond the first year, but to do so he needed the GOA to provide him with the letter of comfort which it had promised. The performance to which Mr.

**1338**

Sanchez referred was substantial. It required the transport of all race cars and equipment to and from Aruba, the transport of 300 to 500 people and their food and lodging, the provision of helicopters, ambulances, medical equipment and arrangements with hospitals. These expenses would cost between $800,000 and $1,000,000 per event, in addition to the sanction fees. Mr. Sanchez or his companies would be required to meet these obligations if Colorado Hills, a startup company, was unable to do so. Prime Minister Eman promised that the GOA would provide the letter of comfort and directed Mr. Sanchez to sign the sanctioning agreements. Prime Minister Eman told Finance Minister Croes to get the letter of comfort issued as soon as possible and directed Mr. Mansur to provide him with a draft of the letter of comfort. Prime Minister Eman told Mr. Sanchez and Mr. Mansur that he would have the letter of comfort for Mr. Sanchez within two weeks and then would get any necessary approval from Parliament.

57. At the conclusion of the meeting Prime Minister Eman asked Mr. Sanchez to immediately organize press conferences to announce the Aruba Motorsports Complex project and the scheduling of the races. Everyone agreed that an Aruban domestic press conference would be held in August of 1999, and that an additional press conference would be organized in September of 1999 to introduce the international press to the project and to the island of Aruba.

58. Thereafter, Mr. Yanowitch and Mr. Mansur's attorney prepared a draft of the letter of comfort, dated July 29, 1999. (Pl. Ex.23). Mr. Mansur personally delivered the draft to Prime Minister Eman and Finance Minister Croes. Prime Minister Eman read it and then handed it over to Finance Minister Croes and asked him: "Can you live with it? Can you defend it?" (5/31 Tr.Trans. at 59). Finance Minister Croes responded affirmatively. Mr. Mansur communicated these conversations to Mr. Sanchez.

59. In furtherance of its support for the Aruba Motorsports Complex project and in order to induce MAI to enter into multi-year commitments with the motorsports sanctioning bodies, on August 4, 1999, Finance Minister Tico Croes wrote a letter to Mr. Mansur indicating that the GOA "intend[ed] to remain a shareholder in Colorado Hills N.V. . . . for a period of at least five years." (Pl.Ex. 29; Def.Ex. 123).

60. Mr. Sanchez testified that he relied on what Prime Minister Eman told him about the GOA providing a letter of comfort. As Mr. Sanchez explained, "That was the Prime Minister of the country. . . . This is like the number one person in the country. I believed him." (5/29 Tr.Trans. at 63). In reliance on those promises, on August 3, 1999, MAI and SCCA Pro Racing Ltd. entered into a multi-year agreement for Trans–Am Series races, with the first to be held on November 10–12, 2000. On August 10, 2000, MAI and CART, Inc. entered into a multi-year agreement for Indy Lights races.

61. Each of the sanctioning agreements listed MAI as "promoter." Each of the sanctioning agreements obligated MAI, as promoter, to pay a substantial sanctioning fee, ranging, for the first year alone, from $221,000 to $500,000. In addition, each of these sanctioning agreements obligated MAI, as promoter, to undertake and provide substantial services, such as: providing for transportation of all race cars and racing equipment to Aruba, providing for

transportation of all racing team personnel to Aruba, providing for storage of all racing cars and equipment in Aruba and providing for hotels for all racing team personnel in Aruba.

62. Pursuant to the Colorado Hills Agreement, MAI was entitled to receive from Colorado Hills its fee for the services it rendered in obtaining these sanctioning agreements and obligating itself to pay fees and perform substantial services pursuant to these agreements. MAI therefore submitted invoices for these fees to Carlo Mansur, as Managing Director of Colorado Hills. Mr. Mansur approved these invoices as appropriate for payment and directed Mr. George Dominicis, on behalf of MAI, to submit them to the Caribbean Mercantile Bank for payment. (Pl.Ex.38, 39, 40, 41; Def.Ex. 615).

63. As detailed above, the GOA, MAI and Colorado Hills all agreed on the conditions under which MAI would be entitled to payment from CMB. As expressly set forth in Mr. Yanowitch's letter to the GOA, and as expressly set forth in the CMB Bank Guarantee, the terms of which were agreed to by the GOA, MAI was entitled to payment from CMB on the condition that (i) MAI has concluded agreements with the respective sanctioning organizations; (ii) MAI has complied with all financial arrangements required by those sanctioning organizations; (iii) the sanctioning organizations have guaranteed racing dates for the Fall/Winter 2000 race season; (iv) MAI has submitted an invoice to Colorado Hills, and (v) the Managing Director of Colorado Hills has approved those invoices. For payments other than those related to the sanctioning agreements, these same documents only required (i) that MAI has submitted an invoice to Colorado Hills, and (ii) that the invoice has been approved by Mr. Mansur, the Managing Director of Colorado Hills.

64. Initially, the Caribbean Mercantile Bank refused to pay MAI's invoices because the bank had some concern over whether the formal conditions of the GOA's Bank Guarantee No. 956 (issued by Caribbean Mercantile Bank as the guarantor for Motorsports America, Inc. as the beneficiary) had been fulfilled. (6/4 Tr. Trans. at 92). When confronted with this serious problem, Finance Minister Tico Croes and Prime Minister Eman telephoned the Chairman of the Board of the Maduro Curiels Bank, Mr. Lionel Capriles, at his home in Curacao. Mr. Capriles, Chairman of the Maduro Curiels Bank that owned 100% of the shares of the Caribbean Mercantile Bank received two phone calls from Finance Minister Tico Croes and Prime Minister Eman after 9:30 p.m. on August 13, 1999. (6/4 Tr. Trans. at 93; 5/24 Tr.Trans. at 57–59). Mr. Capriles was familiar with the Bank Guarantee No. 965 that had been issued by his subordinate bank, the Caribbean Mercantile Bank in Aruba. He testified that when Prime Minister Eman came on the phone to demand that the funds be immediately released to MAI, the Prime Minister told him "there are omissions. We are in a desperate hurry to do this. You have to do this as a favor. Forget the omissions. We have other omissions. Don't worry. We have to have the check because otherwise we lose, if I am not mistaken, the date." (6/4 Tr.Trans. at 94). He further testified the Prime Minister told him; "But he asked me to, regardless of the omission, please see to it that it is paid. Forget the omissions, and that's how it was... More than that, and that the Government would guarantee me if there is any claim because of that omission. He didn't have to go into all of the

details because I told you the next morning when I got to the bank, called Aruba, the letter with the omissions was there in place." (6/4 Tr.Trans. at 94–95).

65. When Mr. Capriles was asked whether or not the GOA objected to any of the payments made by the Caribbean Mercantile Bank to MAI pursuant to the Bank Guarantee No. 965, he replied, "N–O. otherwise we would not have done the transaction. The fact that they called me to do it and the fact that they accepted both checks is proof enough. Otherwise they could have told us, don't send me the check because we are not handling according to the conditions of the documents." (6/4 Tr.Trans. at 96).

66. This testimony lends great credence to the testimony of Mr. Sanchez, MAI and SMG respecting the repeated promises of the Prime Minister and the Minister of Finance (and others in GOA) to issue the letter of comfort and the necessary financial guarantees to make the project successful. It clearly demonstrates, the length to which the Prime Minister was willing to pledge the credit to the GOA, by promising anything. Here, a totally believable independent witness was awakened in the middle of the night with a demand by the Prime Minister of Aruba that he call the officers of a subordinate bank to get checks issued to the Defendants under the Government's guarantee, regardless of whether it met the formal requirements of the bank guarantee or not! If the Prime Minister was willing to do this, literally in the middle of the night, one can only assume that Mr. Sanchez' testimony is correct when he relates numerous similar instances of promises made by the Prime Minister of Aruba on behalf of the Government.

67. When Mr. Capriles called CMB the next morning, he learned that all of the conditions of the CMB Bank Guarantee had been met. As he said, "and the next morning we did pay, but not because of the telephone of Mr. Eman, but because the omissions were corrected. So I killed two birds with the same stone." The conditions that had been met were first, SCCA and CART each acknowledged in correspondence to CMB that they had entered into sanctioning agreements with MAI, that MAI had complied with the financial requirements of those agreements, and that they had guaranteed racing dates for the Fall/Winter 2000 race season. Second, MAI submitted invoices for its services in procuring these agreements to Colorado Hills. Third, Mr. Mansur, as managing Director of Colorado Hills, approved these invoices.

68. As a result, CMB properly determined that MAI was entitled to be paid under its Bank Guarantee. CMB issued a check in favor of MAI in the amount of $2,815,000, the amount to which MAI was entitled under the invoices which had been approved by Mr. Mansur, as Managing Director of Colorado Hills. CMB delivered this check to Finance Minister Croes, who ultimately arranged for its delivery to MAI.

69. On August 18, 1999, a domestic press conference was held in Aruba at which Prime Minister Eman publicly announced the Aruba Motorsports Complex project, and supported the project as being the spark that would start the economic development of the San Nicolas area. At the request of Prime Minister Eman, race car driver and racing promoter Emerson Fitipaldi appeared at the press conference to promote the Aruba racetrack and to promote the Latin American and Caribbean racing series that he and Mr. Sanchez were developing. During the press con-

ference Mr. Sanchez again reminded Prime Minister Eman that he had not received the letter of comfort. The Prime Minister assured Mr. Sanchez that it was coming.

70. In late August, 1999, MAI and American LeMans Series, L.L.C. ["ALS"] entered into a multi-year agreement for LeMans races. Again, MAI submitted its invoice for services rendered in procuring these agreement to Colorado Hills. Mr. Mansur, as Managing Director of Colorado Hills, approved payment of that invoice and directed MAI to seek payment from the CMB Bank Guarantee. Again, all of the conditions to the CMB Bank Guarantee were met: ALS acknowledged in correspondence to CMB that it had entered into a sanctioning agreement with MAI, that MAI had complied with the financial requirements of that agreements, and that it had guaranteed racing dates for the Fall/Winter 2000 race season; MAI submitted invoices for procuring this agreement to Colorado Hills; and Mr. Mansur, as managing Director of Colorado Hills, approved these invoices. (Def.Ex.616). CMB properly determined that MAI was entitled to be paid under its Bank Guarantee. CMB issued a check in favor of MAI in the amount of $1,235,000, the amount to which MAI was entitled under the invoices which had been approved by Mr. Mansur, acting for Colorado Hills.

71. Aruba posed many challenges as a racing venue compared to the United States, including problems relating to: transportation of the racing teams, the absence of existing racing facilities, a difficult race site from a design and construction standpoint, and the lack of a suitable road system to San Nicolas to readily permit race team, participant and spectator access. All of these challenges, and many others, had to be overcome by Colorado Hills, MAI and SMG. On various occasions, Mr. Sanchez informed Prime Minister Eman and Minister Tico Croes that MAI and SMG would require the extensive investment of time and energy by Mr. Sanchez and his colleagues at MAI and SMG and the financial resources of MAI and SMG to overcome such challenges in order to complete and realize the project on a timely basis. The GOA officials repeatedly encouraged and induced Mr. Sanchez, SMG and MAI to make these substantial investments of time, energy and money. Of all of the Project Partners, only MAI and SMG had the requisite background and experience to design and build the Aruba Motorsports Complex to the satisfaction of the professional motorsports sanctioning organizations. The GOA fully understood that the burden to overcome the numerous obstacles posed for the project would fall primarily on MAI and SMG.

72. One of the most critical challenges of the Aruba Motorsports Complex project was to design and construct the facility in conformity with the requirements of the sanctioning organizations and prior to the scheduled races. The project was to be developed in the San Nicolas area of the country, a location that Prime Minister Eman understood lacked the infrastructure found in the more developed areas of the country. Nonetheless, Prime Minister Eman encouraged the parties to commence construction in San Nicolas as soon as possible.

73. The GOA knew that, due to the tight deadlines, any delays could jeopardize the success of the project by increasing the cost of construction and by missing the race deadlines. The Project Partners agreed that construction for the project would commence in early September, 1999.

On September 10, 1999, Colorado Hills had made the first call to SMG to make its first capital contribution of $200,000 to Colorado Hills. This payment was made directly to Colorado Hills by SMG. By this time SMG and MAI had expended substantial time and expenses towards the development of the Aruba Motorsports Complex.

Despite MAI's and SMG's performance of their obligations and Prime Minister Eman's repeated promises, by late September of 1999 the GOA had yet to produce the letter of comfort it promised to Mr. Sanchez.

74. On September 20, 1999, a meeting was held in Aruba which was attended by Prime Minister Eman, Finance Minister Tico Croes, Minister Junior Croes, Mr. Sanchez, Mr. Yanowitch, Mr. Mansur and others involved in the motorsports project. At that meeting Mr. Sanchez complained that the GOA was not abiding by its promises to him, MAI and SMG. Mr. Sanchez was upset that he and MAI had executed the sanctioning agreements and held the press conference requested by Prime Minister Eman, but that the GOA had yet to provide the much promised letter of comfort. Prime Minister Eman assured Mr. Sanchez, once again, that the letter of comfort would be issued. Prime Minister Eman requested Mr. Sanchez to proceed with the international press conference scheduled for late September.

75. On September 16, 1999, Mr. Mansur, as Managing Director of Colorado Hills, sent a letter to the GOA Council of Ministers formally requesting the assistance, support and contribution of the GOA in the Aruba Motorsports Complex. (Def.Ex.132). Mr. Mansur had sent earlier drafts of this letter to Prime Minister Eman as early as June 18, 1999 (Def.Ex.141) and negotiated its contents with the Prime Minister so that, when the final letter was sent on September 16, its contents would be acceptable to the GOA.

76. The June 18 draft provided that the GOA would make cash contributions of US$4,500,000 for five years. It also provided that payments to MAI would be secured by a letter of credit from ARUCO (then known as Aruba Motorsports Complex or AMC). Following negotiations with Prime Minister Eman, these provisions were changed to eliminate the GOA's cash contribution of US$4,500,000, but also were changed to provide that MAI would get "appropriate guarantees from the Government securing the payment of such obligations (from Colorado Hills)." (Def.Ex. 138 at 3; Def.Ex. 139 at 3; Def.Ex. 140 at 3).

77. Among other matters, following these negotiations, Mr. Mansur's September 16 letter described in detail the specific contributions required to be performed by the GOA relating to the development and operation of the project, including assurances from the GOA securing Colorado Hill's obligations to MAI under the Colorado Hills Agreement. Mr. Mansur's September 16 letter explained the role of MAI and the its need for appropriate financial assurances from the GOA:

> The U.S. Sanctioning bodies shall not authorize MAI to sanction the above listed motorsports events in Aruba, unless they know that an experienced promoter is involved (thus the participation of SMG) and that they are provided with appropriate financial guarantees, including substantial levels of participants insurance. Sanctioning bodies want to be associated with successful events, which are run by experienced Promoters who provide them with suitable financial as-

surances. *That is why before authorizing MAI to sanction an Aruba motorsports event MAI would have to provide letters of credit from a United States financial institution acceptable to the sanctioning bodies to guarantee the financial obligation due to the sanctioning organization. MAI would therefore require similar letters of credit from Colorado Hills, **and appropriate guarantees from the Government securing the payment of such obligations**.*

The GOA did not respond to this request by stating that such "appropriate guarantees" could not be delivered. Instead, the GOA responded, in a letter by Prime Minister Eman on September 27, 1999 (Def.Ex.142), which was cosigned by four other Ministers, that:

> The Government of Aruba is in principle *willing and able to provide you with the assistance, support and contribution with respect to the development and realization of the Project as more fully described in your aforementioned letter*, subject to the compliance with and observance of all applicable laws, regulations and policies.

Moreover, that same letter directed the parties to proceed with the project:

> In anticipation of the formalization of the assistance, support and contribution to be provided by the Government of Aruba to the Project we confirm that you may in principle proceed with the preparation and preliminary realization of the Project at the site indicated in more detail in your aforementioned letter, such in close consultations with the relevant governmental agencies such as Dienst Domeinbeheer, Directie VROM, Directie Economische Zaken, Handel & Industrie and Directie Financien to procure that the preparation and prelimi-

nary realization of the Project are conducted in conformity with all applicable laws, regulations and policies.

At Mr. Mansur's request, Prime Minister Eman's letter was cosigned by the other ministers on the Council of Ministers to indicate their approval. As expected, Mr. Mansur informed Mr. Sanchez about this approval. Notwithstanding its positive response to Mr. Mansur's September 16, 1999 letter, the GOA never provided the land, the tax holidays or the letter of comfort, each of which had been detailed in Mr. Mansur's letter.

78. In September 1999, Prime Minister Eman instructed Mr. Mansur, as Managing Director of Colorado Hills, to conduct a full-fledged feasibility study for the racetrack project. Mr. Mansur hired Deloitte & Touche ("Deloitte") for this purpose. Deloitte performed substantial research and investigation. Mr. Mansur met with Deloitte personnel more than ten times. Deloitte personnel met with members of the GOA. Mr. Mansur presented the final Deloitte feasibility study to Finance Minister Croes and told him to call Deloitte directly if he had any questions. The GOA acknowledged and ratified the results of the Deloitte feasibility study. As stated by Finance Minister Croes in an October 14, 1999 memo (Def.Ex.148): "As far as the feasibility of the project is concerned, I would like to note that the government, only after a careful examination of the temporary numbers, has signed the LOI. The financial predictions of June 1999 showed that the project is feasible. This is again confirmed in the recently completed feasibility study." In addition, Parliament acknowledged and relied on the results of the Deloitte feasibility study. As stated in its "Mocion," "according to a feasibility study of Deloitte & Touche the project is

feasible." (Def.Ex.149). Finally, the GOA relied on the Deloitte study in its written statement to the Aruban court in the environmental lawsuit. In that statement, it told the court about the study and the study's conclusion that "[w]e therefore arrive at the conclusion that the project can be financially feasible." (Def.Ex. 590 at 7).

79. Thereafter, Mr. Mansur met with Minister Junior Croes to inform him that he had met with the contractors for the project and that "we are ready now to mobilize the site and that we are going to start moving heavy machinery to the site for the excavation to start." (5/31 Tr. Trans. at 90). Minister Junior Croes told Mr. Mansur, after discussing the matter with Prime Minister Eman, "You are not authorized to mobilize nor begin construction." (5/31 Tr.Trans. at 91). Mr. Mansur told Minister Junior Croes that they were reaching a critical time frame for completing the racetrack in time for races in November 2000, to which Minister Junior Croes had no response.

80. At the request of Prime Minister Eman, and in reliance on the GOA's repeated promises and assurances of support, Mr. Sanchez organized and staged an international press conference on September 28, 1999, in Aruba. Approximately 200 international motorsports journalists invited by Mr. Sanchez attended the press conference. Prime Minister Eman spoke at the press conference and stated that the Aruba Motorsports Complex was important to the San Nicolas area and that the GOA was fully committed to the project. Senior executives from the United States sanctioning organizations attended the press conference and confirmed that they had committed racing dates to the project for the 2000 season.

81. The Aruba race track project was immediately publicized worldwide. However, by publicizing the venture in this fashion at the direct request of Prime Minister Eman, the potential financial and personal liability for Mr. Sanchez, MAI and SMG in the project increased significantly. Mr. Sanchez's name and reputation, along with those of MAI and SMG, became committed to the project and its success. Mr. Sanchez, MAI and SMG were forced to undertake substantial financial and business commitments in order to secure the race dates and to begin overcoming many of the challenges posed in the development of the project.

82. On September 24, 1999, the GOA, Prime Minister Eman and other Ministers, and Colorado Hills were sued by various environmental groups who sought to stop the racetrack project. The GOA responded to the lawsuit in writing on September 27, 1999. (Def.Ex.146). Among other things, it acknowledged to the court that the race track was a "gift from heaven" because "it was the first commercially and economically productive project that the government could attract for San Nicolas." It also acknowledged that the various governmental agencies responsible for the land and the environment had properly approved the project and that "the race track meets all policy criteria in the field of public housing, environment and regional planning."

83. The GOA's response to the court also admitted that the GOA had issued "temporary licenses" for the project to proceed, and that the GOA had issued "its commitment to the project developer that the leasehold property required for the project, the final licenses and further necessary facilities will be granted, provided that the legal requirements and policy criteria are fulfilled" and that it issued this commitment "in order to enable the pro-

ject developer to start with the project in the short term, without having to wait for the formalization of the leasehold transfer, issuance of final licenses, etc., which usually takes some time."

84. The GOA admitted to the court that under the "principle of legitimate expectations," the interests of the participants in the project, created by the GOA through these assurances, cannot be ignored:

> Finally, the Country must also take account the interests of the project developer, who has made considerable investments based on the government concessions and temporary licenses, which cannot be canceled. The principle of legitimate expectations cannot just be disappointed.

This "principle of legitimate expectations," which gave rise to liability against the GOA in the *Trias* case under similar circumstances, is discussed at length below.

85. The Court of First Instance of Aruba issued its ruling on October 6, 1999. (Def.Ex.590). The court explained that the plaintiffs were challenging the racetrack project on various grounds, including the GOA's failure to comply with the accounting ordinance. *Id.* at 4–5. The court rejected all challenges to the project and concluded: "[T]here are no grounds to prevent Aruba or Colorado Hills from constructing the racetrack or to postpone its construction, or to obligate them on pain of a penalty to comply with the Ordinances stated by plaintiffs." *Id.* at 9.

86. The environmental concerns, however, led to the need to redesign the racetrack. Mr. Sanchez accomplished this redesign by October 19, 1999 and obtained the approval of the sanctioning organizations to the new design.

87. In October 1999, Mr. Sanchez sought to make an additional capital contribution on behalf of SMG for $300,000. He sent Jorge Dominicis to Aruba with a check in that amount. Mr. Dominicis tendered the check to Mr. Mansur, as Managing Director of Colorado Hills. Mr. Mansur refused to accept the check because Colorado Hills owed Mr. Sanchez's company, SMG, more than $700,000 at that time.

88. On October 1, 1999, Mr. Mike E. de Meza, the Policy Advisor on Energy Affairs for the GOA, was appointed by the Council of Ministers of the GOA as the GOA's project coordinator for the motorsports project and as Chairman of the Supervisory Board of Colorado Hills. Prime Minister Eman, Minister Tico Croes, and Minister Junior Croes, directed Mr. de Meza to report directly on all matters relating to the motorsports project to Minister Junior Croes. Thereafter, Mr. Mansur, as Managing Director of Colorado Hills, met with Mr. de Meza on almost a daily basis, and was also present when Mr. de Meza reported developments on the project to Minister Junior Croes.

89. On October 18, 1999, the GOA Parliament passed a "Mocion" in support of the Aruba Motorsports Complex and approved a capital contribution by the GOA of $3 million in Colorado Hills, a guarantee by the GOA of a $3 million line of credit at Caribbean Mercantile Bank, N.V., for the benefit of MAI, the enactment of legislation to legalize these contributions, and the issuance of the letter of comfort for the benefit of MAI. In the words of the GOA's representative, Mr. de Meza, this motion made the matter a "done deal" as far as Parliament was concerned. Minister Junior Croes told Mr. Sanchez that the "mocion" was a "green light" for the project. As explained by Senator Glenbert Croes,

the approval by the "Mocion" of "any other comfort letters as mentioned above" was a specific reference "to the letter of comfort that ... the Prime Minister had promised to Mr. Sanchez." The approval of the "Mocion" was "to basically cover the government's actions or the process the government is in to issue the letter of comfort for the subsequent races." (6/4 Tr. Trans.—Video Dep. of Glenbert Croes Dep.).

90. Soon thereafter, the GOA again informed Mr. Sanchez that the letter of comfort would be issued shortly. All that was necessary to finalize the letter of comfort was the signature of Finance Minister Tico Croes.

91. After the "Mocion" was passed, Mr. Mansur spoke with Minister Junior Croes and told him that he had the contractors ready to start excavation for the racetrack. Again, Minister Junior Croes told Mr. Mansur: "You are not authorized to start." (5/31 Tr.Trans. at 94).

92. Without informing the Project Partners, including Mr. Sanchez, on October 22, 1999, only four days after Parliament's approval of the racetrack project, Prime Minister Eman engaged in discussions with certain labor unions about whether the GOA should break its commitments to the Project Partners concerning the racetrack project. As a result of these discussions, Prime Minister Eman entered into a written agreement with these labor unions, making certain concessions. (Def.Ex.150). Mr. Mansur estimated that the GOA's agreement with the unions delayed the project by at least three months, which jeopardized its viability.

93. In particular, unknown to Mr. Sanchez and the other Project Partners, Prime Minister Eman agreed with the un-ions that the GOA would sell its investment in Colorado Hills, would not provide any further financial support for the project, and would conduct further environmental studies of the race track project before agreeing to permit the development to proceed. Prime Minister Eman acquiesced to these pressures and ordered an independent environmental study of the race track project site, even though the GOA had itself already conducted an environmental analysis which was favorable to the project, had already given approval for construction of the project and had already obtained a court order allowing the project to proceed. In addition, and again unknown to the other Project Partners, the GOA agreed to sell its shares in Colorado Hills, notwithstanding its prior assurance that it would remain a shareholder for at least five years.

94. Mr. Mansur testified that the GOA's surprise announcement that it would sell its interest in the project was "devastating" because "it sends the very worst signal to the financial institutions whom we were looking to get financing from." (5/31 Tr.Trans. at 97). At the same time, Finance Minister Croes made public statements on the radio that he had doubts about the project. These statements also negatively affected Mr. Mansur's ability to get financing for Colorado Hills.

95. On November 3, 1999, another meeting was held in Aruba attended by Prime Minister Eman, Minister Tico Croes, Minister Junior Croes, Mr. Sanchez, Mr. Mansur and Mr. Yanowitch to discuss the status of the motorsports project. Mr. Sanchez once again complained to Prime Minister Eman that the GOA had not yet issued the letter of comfort standing behind Colorado Hills and assuring Colorado Hills' obligations to MAI.

96. Mr. Sanchez then informed Prime Minister Eman that he was leaving on an afternoon flight to return to Miami. Prime Minister Eman once again told Mr. Sanchez that the GOA would issue to MAI a letter of comfort assuring Colorado Hills' payment of MAI's fees. Prime Minister Eman asked Mr. Sanchez to stay over one additional night in Aruba and that the letter of comfort would be issued by the GOA and delivered to Mr. Sanchez on the following day.

The stay was extended until November 4, 1999, but no letter of comfort was issued or delivered. However, on that day, Prime Minister Eman spoke by telephone to Mr. Mansur and assured him that the letter of comfort would be delivered to Mr. Sanchez within seven days. Prime Minister Eman asked Mr. Mansur to prepare and provide the GOA with another draft of the letter of comfort. A draft of the letter of comfort was prepared and transmitted to the GOA.

97. By mid-November of 1999, in light of the impending date for the first race scheduled to be held in November of 2000 and the increasing concern that the Aruba Motorsports Complex would not be completed on time, a public/private intergovernmental task force was established with the participation of the GOA for the purpose of working through any government bureaucratic hurdles to the commencement of construction of the project. The primary goal of the task force was to cut through any government red tape that would cause any further construction delays, and to obtain the necessary permission from the Department of Public Lands ("Domeinbeheer") and the Department of Public Works ("DOW") to immediately commence construction of the project. Participating in this task force were,

among others, Minister Tico Croes and his assistant Mr. Nilky Kock, Mr. Harry F. Bareno, from the Ministry of Economic Affairs, Mr. Franklin Abath of Domeinbeheer, Mr. Dennis Wever of DOW, Mr. Elton Lioe-A-Tjam of VROM, Mr. Roy Brown and Mr. Yanowitch as counsel to Mr. Sanchez, MAI and SMG, Mr. Mike de Meza, as the Government's representative on the project, Mr. Michel Janssen from Colorado Hills, and Minister Junior Croes, who was appointed the Chairman of the task force. This task force held weekly meetings.

98. All parties, as well as the sanctioning organizations, had originally anticipated that construction would begin in November 1999. This did not happen because of the GOA's agreement with the labor unions to conduct a new environmental study, to sell its interest in the project and to not provide further financial support. During November 1999, Mr. Sanchez contacted the sanctioning organizations to nevertheless reassure them that the project would be completed on time for the races to be held, as he had been promised by Prime Minister Eman. Mr. Sanchez traveled to Atlanta and Denver for this purpose.

99. On December 8, 1999, Mr. Sanchez, on behalf of MAI, entered into two sanctioning agreements with Historic Sports Car Racing for the sanctioning of races in Aruba. On December 15, 1999, Mr. Sanchez, on behalf of MAI, entered into a sanctioning agreement with American Motorcyclists Association Pro Racing for the sanctioning of races in Aruba. The execution of these agreements entitled MAI to additional fees from Colorado Hills which could be drawn from the CMB bank guarantee. However, Mr. Sanchez did not submit an invoice for these sanctioning agree-

ments, or attempt to draw on the CMB bank guarantee, because of the uncertainty he felt about the future of the Aruba race-track project. He did not want to jeopardize his reputation and credibility with two more sanctioning organizations.

100. In December, 1999, Mr. de Meza, the GOA's representative to the project, spoke with Finance Minister Croes on several occasions concerning the letter of comfort requested by Mr. Sanchez, MAI and SMG. Finance Minister Croes told Mr. de Meza that he agreed with the language in the latest draft of the letter of comfort and that he was satisfied with the feasibility of the project. Minister Tico Croes further informed Mr. De Meza that he was just waiting for the final draft of the environmental report promised to the unions by the Prime Minister on October 22, 1999 and the presentations of these findings and that he would then issue the letter of comfort. In Mr. de Meza's words, "The first time I talked to him [Finance Minister Croes] about it he told me that they were comparing and trying to agree on the content of the letter of comfort. Then after when I talked to him again he agreed that they were satisfied with the content of the letter of comfort, the content of it, but that he is not going to issue it until after the environmental impact study has been done .... And once that study is done he has no problem in providing that letter of comfort." (6/4 Tr.Trans.—Video Dep. of Mike De Meza).

101. During a trip to Aruba near the end of December, 1999, Minister Junior Croes told Mr. Sanchez that the latest draft of the letter of comfort had been approved by Finance Minister Tico Croes.

102. Within several weeks the environmental report by the independent consulting firm from the Netherlands was completed with no negative findings. However, notwithstanding Finance Minister Croes' statement to Mr. de Meza that the letter of comfort would be delivered after this environmental report, the letter of comfort was not delivered.

103. The task force's work culminated with the issuance of the letters of permission from DOW and Domeinbeheer, on December 16, 1999, and January 13, 2000, respectively, authorizing Colorado Hills to commence construction of the project. No other GOA approvals were required for construction to commence.

104. At the time the letters of permission were issued by DOW and Domeinbeheer, Minister Tico Croes and the other GOA government members of the task force had not stated any official objection to hold up the commencement of construction or the issuance of the financial support by the GOA to MAI. Nevertheless, during the same general time frame, Finance Minister Tico Croes made public statements expressing doubts about the Aruba Motorsports Complex project.

105. Despite Minister Tico Croes' statement to Mr. De Meza and Minister Junior Croes' statement to Mr. Sanchez that the draft of the letter of comfort had been approved, and Prime Minister Eman's repeated promises to Mr. Sanchez, MAI and SMG, the GOA did not issue the letter of comfort after the issuance of all the letters of permission by the various governmental departments. By January of 2000 the GOA had not yet delivered the letter of comfort to Mr. Sanchez and MAI.

106. In January, 2000, Mr. Sanchez met with Prime Minister Eman and Mr. Mansur. Mr. Sanchez told the Prime Minister that he had been approached by the government of Curacao about moving the

proposed races to that island. Mr. Sanchez asked Prime Minister Eman whether the GOA would fulfill their numerous promises regarding the letter of comfort and, if it did not intend to do so, whether the GOA would release Mr. Sanchez from the Aruba racetrack project so that he could move the races to Curacao. Prime Minister Eman told Mr. Sanchez and Mr. Mansur that he did not want them to move the racetrack project to Curacao and represented to them that the GOA would do what it had repeatedly promised and provide the letter of comfort and take all steps necessary to move the project forward. Mr. Sanchez believed these assurances and did not pursue the opportunity of moving the races to Curacao.

107. Mr. Sanchez again met with Prime Minister Eman in his office on February 16, 2000. Mr. Sanchez pointed out that the GOA had not carried out its promises and assurances, made a month earlier. Mr. Sanchez again asked Prime Minister Eman to give him permission to move the races to Curacao. Prime Minister Eman again insisted that Mr. Sanchez refrain from any consideration of moving the races to Curacao. Mr. Sanchez again took Prime Minister Eman at his word and did not pursue the opportunity of moving the races to Curacao.

108. As a result of the negative public statements about the project made by Minister Tico Croes during the preceding months, the GOA's public announcement that it would sell its interest in Colorado Hills, and the GOA's insistence on further feasibility studies, in order to stage the races as scheduled in November 2000 it became necessary to obtain a construction financing guarantee from the GOA. As Mr. Mansur testified: "I explained to the Prime Minister given all that has happened already, the negativism, the government pulling out, the protest against this project, given that the Central Bank has come home to a negative impression of this racetrack, I told him that in order for us to accomplish this financing and to begin construction and to deliver this project in November, that it is humanly impossible. If they wanted the project, then government would have to step up to its responsibility and provide a government guarantee, which in turn would immediately make funds available to the company for to us begin construction immediately. That's what I informed him." (6/3 Tr.Trans. at 22).

109. Over the next several months Colorado Hills worked with the GOA to obtain the necessary financial guarantees for the construction financing. Prime Minister Eman eventually agreed that the GOA would provide these construction financial guarantees. To promote politically the financial guarantees, Prime Minister Eman personally arranged for a series of meetings held throughout March of 2000 among representatives of Colorado Hills, Mr. Sanchez and various Aruban business leaders, labor unions, and community groups. Prime Minister Eman's publicly stated position to each of these groups was that all of the hotels in Aruba had been built with the assistance of GOA financial guarantees, and that it was similarly important for the people of San Nicolas that guarantees be given to enable the race track project to proceed. Prime Minister Eman also arranged for the financial guarantee plan to be approved by the Parliament.

110. On March 27, 2000 Prime Minister Eman organized a presentation to the GOA Parliament by Colorado Hills regarding the Aruba Motorsports Complex project and invited Mr. Sanchez and Mr. Rog-

er Bailey, an executive representing the United States sanctioning body, CART, to attend and make the presentations. On that same day, after the presentations, a majority Parliamentary coalition approved the GOA's issuance of financial guarantees for construction of the project.

111. Immediately after the Parliamentary session, Prime Minister Eman held a meeting attended by Mr. Sanchez, Mr. Bailey, Mr. De Meza, and others. Prime Minister Eman stated that all necessary approvals had been obtained from the two coalition parties in the government (the AVP and OLA parties) for the issuance of financial guarantees and to move the project forward. Prime Minister Eman also told Mr. Sanchez and others to immediately hold a press conference and announce that the construction guarantee would be issued, there were no more hurdles and construction could start immediately. In front of the other individuals in attendance, Prime Minister Eman asked Roger Bailey what else he could do to assure CART that the financial guarantees would be provided so that the project could move forward. Mr. Bailey told him to call Andrew Craig, the Chairman and President of CART. Again, in front of the other individuals in attendance, Prime Minister Eman placed a telephone call to Andrew Craig at Craig's offices in Detroit and assured Mr. Craig that all of the necessary hurdles had been overcome for the GOA to issue the financial guarantee for the construction and that the construction of the project could proceed immediately. Mr. Craig asked Prime Minister Eman if CART could provide any help to the GOA, and Prime Minister Eman responded that CART could help by advertising and promoting the upcoming events and the island of Aruba.

112. Between January of 2000 and the March 27 meeting of Parliament, the GOA arranged to sell $2,400,000 of its equity interest to a wealthy investor, Mr. Van den Nieuwenhuyzen. As Prime Minister Eman explained, Mr. Van den Nieuwenhuyzen was "a very wealthy man, very experienced, and was completely willing to give us everything necessary to make it happen." (5/22 Tr.Trans. at 26). During that time period, no additional terms or conditions were placed by Prime Minister Eman, or any other GOA official, on the issuance of the GOA financial guarantees for the construction costs. As testified by the Prime Minister at trial, obtaining construction financing was no longer an issue. In his words, the "financial part at that moment, to us, was not a major concern anymore." (5/22 Tr.Trans. at 26). It was no longer a "big issue." (5/22 Tr.Trans. at 29).

113. By April 2000, the delays in the construction had reached a ˙critical juncture and it was becoming increasingly difficult for the project's contractors to assure that the project would be completed in time to stage the races scheduled to commence in the fall of 2000. Nevertheless, throughout this time frame Mr. Sanchez and his companies continued to work towards realization of the project by arranging for certain temporary facilities (such as bleachers and fencing) to be used so the first races could be held on schedule, after which permanent structures could be built. In addition, throughout this time period Mr. Sanchez continued to travel around the United States, meeting with the sanctioning organizations and the companies involved in television and advertising promoting the forthcoming races in Aruba.

114. Rather than carrying out the promises made by Prime Minister Eman on March 27, in early April 2000, Minister Tico Croes unilaterally appointed a new

GOA commission with the alleged purpose of investigating, yet again, the feasibility of the motorsports project. Mr. De Meza, the GOA's motorsports project's coordinator and the GOA's representative on the Board of Colorado Hills, was not appointed to the commission nor asked to take part in the feasibility study. Minister Tico Croes ordered that Mr. De Meza, the GOA representative looking after the GOA interests in the project, not be involved in the commission nor get any information on the feasibility investigation.

115. On April 23, 2000, another meeting was held in Aruba and attended by, among others, Prime Minister Eman, Minister Junior Croes (who had resigned as of January 1, 2000 for personal reasons but whose input in this matter was still wanted by Prime Minister Eman and Minister Tico Croes) and Mr. Glenbert Croes, the leader of the OLA party, which formed the government coalition with the AVP party. At that meeting, Prime Minister Eman stated that he was taking over the project. He stated that, as a condition to the GOA providing the construction financing guarantee, he wanted written assurances from the shareholders of Colorado Hills that they would commit to invest $12 million in equity in the company if the GOA provided a $15 million construction financing guarantee.

116. As a result of Prime Minister Eman's demand, and with the consent of the Prime Minister, Mr. Junior Croes obtained letters of commitments from each of the Project Partners, including Mr. Sanchez's company, SMG, wherein they committed to invest a total of $12 million in equity in Colorado Hills, subject to the GOA granting the financial guarantee. After receiving these letters of commitment Mr. De Meza delivered them to the GOA.

117. The Court finds that if the GOA had fulfilled its promise to furnish a $15 million construction guarantee, after receipt of the $12 million in equity commitments from the Project Partners, the racetrack could have been constructed. It would have a fully completed permanent road racetrack, with temporary bleachers, but all necessary facilities for the planned races to have been held in November 2001.

118. The GOA did not keep its promise. On April 28, 2000, Finance Minister Tico Croes sent a letter to Carlo Mansur Managing Director of Colorado Hills, that outlined for the first time, new terms and conditions which Minister Croes demanded before the GOA would issue the promised construction financing guarantee. (Pl.Ex. 108, Def.Ex.166). Finance Minister Croes' letter demanded the following conditions:

a. a requirement (Financial Condition # 2) that the investors contribute US$15 million in equity, plus another $2 million for contingencies (Financial Condition # 3). This increased the demand by $2 million over the demand of a few days before when the GOA had told the investors that it would provide the construction guarantee if they contributed $12 million in equity;

b. the replacement of Mr. Mansur as the Managing Director of Colorado Hills (Management Condition # 18) Mr. Mansur and his family were the single largest investors in the project, having already invested millions of dollars in the project and had pledged to invest millions of dollars more;

c. the hiring of a new Managing Director who had "significant knowledge and experience in developing and managing motorsports facilities of the type being proposed" (Management Condition # 18),

even though everyone, including the GOA, knew that no such person existed in Aruba and knew that it would take months to hire such a person from outside of Aruba and to familiarize that person with the project and the workings of the Aruban government;

d. elimination of all fees to Mr. Sanchez' company, SMG, for project construction supervision (Management Condition # 15). (The GOA takes the position in this litigation that Mr. Sanchez' companies were not entitled to fees for procuring the sanctioning agreements, but were only entitled to fees for their supervision of the project);

e. replacement of Mr. Sanchez and his company with another person to supervise construction of the racetrack (Management Condition # 15), even though the GOA knew that Mr. Sanchez, through his companies, was responsible to the United States sanctioning organizations for proper construction of the racetrack;

f. the subordination of any other SMG fees to the project debt (Financial Condition # 10). This meant that SMG's payments would be delayed to an indefinite future date;

g. limiting SMG's fees for services during the first race year, and eliminating any agreement for such fees after the first year, instead providing that such fees would be "subject to negotiation" after the first year (Financial Condition # 9);

h. a provision giving the GOA a 20% equity interest in Colorado Hills. The GOA had previously sold almost its entire equity interest (Management Condition # 13);

i. A provision making virtually all transactions by Colorado Hills subject to the prior written approval of the GOA Minister of Finance (Management Condition # 16);

j. a provision requiring all of the investors of Colorado Hills to pledge their shares in Colorado Hills to the GOA (Legal Condition # 20).

119. Mr. Mansur attempted to negotiate the various new conditions which had been imposed by Finance Minister Croes in his April 28 letter. As reflected by Mr. Mansur's letter of May 9, 2000 (Def.Ex.323), the GOA was inflexible in response to this attempted negotiation.

120. After Senator Glenbert Croes, who at this time was Vice Minister, received Finance Minister Croes' April 28 letter, he met and had a discussion with Prime Minister Eman and Finance Minister Croes. Prime Minister Eman told Finance Minister Croes that he went "too far." Senator Croes testified that, "The Prime Minister told Tico in front of me in his office that he had gone too far. But he assumed a position that he didn't want to change."

121. The April 28 letter from Minister Tico Croes raised demands and conditions that had never been raised at any time by Prime Minister Eman, Minister Tico Croes, the Aruban Parliament or by any other GOA official as a condition for the GOA's support of the Aruba Motorsports Complex project, and were in fact contrary to the GOA's prior assurances.

122. Finance Minister Tico Croes demanded these new conditions even though the GOA had encouraged and induced Mr. Sanchez, MAI and SMG to proceed with the Aruba Motorsports Complex project and expend substantial time, effort and financial resources, through multiple assurances and promises, including (i) its

direct request to Mr. Sanchez that he and MAI proceed to execute agreements with the motorsports sanctioning organizations and place himself, MAI and SMG at serious financial risk; (ii) the approval by the GOA Parliament for the project and for the issuance of all necessary letters of comfort; (iii) Prime Minister Eman's several representations to Mr. Sanchez that the GOA would provide financial support to him and MAI; (iv) the GOA's request for and participation in an international press conference with Mr. Sanchez publicly to announce and promote the project; (v) Prime Minister Eman's statements to Mr. Sanchez and representatives of ARS and CART that all hurdles to the granting of the Government's financial guarantees had been surmounted; (vi) Prime Minister Eman's refusal to permit Mr. Sanchez to attempt to mitigate his damages in late July 1999 and again in January and February of 2000 and transfer the project to another country; and (viii) the granting by the GOA of permission to commence construction on the project.

123. According to Mr. De Meza, the GOA's representative to the project, the conditions imposed by Finance Minister Croes were "in bad faith," (6/4 Tr.Trans.—Video Dep. of Mike De Meza), and were designed "to kill the project." (6/4 Tr. Trans.—Video Dep. of Mike De Meza). Mr. De Meza told Mr. Sanchez by phone, shortly after this letter was sent, that he believed it had been written in bad faith to put an end to the project in order not to go forward with the project. Minister Junior Croes told Mr. Sanchez in a phone conversation at about the same time that the April 28 letter was "the end of the project."

124. The Court agrees with the assessments by Senator Glenbert Croes, Minister Junior Croes and Mr. de Meza, that the GOA's April 28 letter was written in bad faith for the specific purpose of terminating the Aruba Motorsports project.

125. The Court finds that the conditions had never been discussed before were so extensive, unreasonable and onerous, that it was patently obvious that the letter had been prepared and transmitted in bad faith and in a calculated effort to destroy the Aruba Motorsports Complex project.

126. As a result of the GOA's broken promises and the political maneuverings of Minister Tico Croes to undermine the success of the Aruba Motorsports Complex project, on May 2, 2000, Mr. De Meza tendered his resignation as the GOA's project-coordinator for the Aruba Motorsports Complex and Chairman of Board of Colorado Hills as the GOA's representative.

127. The April 28 letter from Minister Tico Croes demonstrated that the GOA had no intention of living up to its often stated promises and commitments. If the GOA's conditions, as demanded by Minister Tico Croes in his April 28 letter, had been known at the inception of the Joint Venture almost one year before, neither Mr. Sanchez, MAI nor SMG would have proceeded to expend substantial time, effort, and financial resources towards the development of the Aruba Motorsports Complex.

128. The Court agrees with the statement by Senator Glenbert Croes, made under oath to an Aruban court. At the time of this statement he was Vice Minister of the GOA. He stated:

I believe that the Government of Aruba acted wrongfully toward Mr. Sanchez in the Aruba race track project. The Government specifically and purposefully in-

duced Mr. Sanchez with promises of financial support to commit his name, reputation, money, time and effort to the project. The Government of Aruba fully understood that the project could not proceed without Mr. Sanchez's involvement. However, the Government of Aruba broke their repeated promises to Mr. Sanchez to provide the promised letter of comfort to protect Mr. Sanchez from the business risks involved, and Mr. Sanchez was harmed as a result. I believe that Mr. Sanchez and his companies fully met their obligations to the project. I regret that the Government of Aruba did not meet its obligations to him.

### DAMAGES

129. If the Government of Aruba had acted in good faith towards Mr. Sanchez and his companies, the Court finds that the Aruba Motorsports Complex would have been completed, if necessary with at least some of the facilities constructed in a temporary manner for the first races, and with permanent facilities being completed thereafter. The sanctioned races would have been run as planned at the Aruba Motorsports Complex for at least five years as set forth in the Colorado Hills Agreement.

130. Defendants/Counter–Plaintiffs, MAI and SMG, have introduced evidence as to the profits they would have earned from those races for the years covered by the Colorado Hills Agreement. The Court finds that the methodology utilized in calculating these profits employs a reasonable formula by which to measure those profits, taking into account, the projected revenues and expenses of MAI and SMG. The Court agrees with the expert for MAI and SMG who testified that the situation before this

Court involves a higher degree of certainty than usual, because MAI's and SMG's projected revenues are determined by the express terms of the Colorado Hills Agreement.

131. Although Defendants/Counter–Plaintiffs make a strong and persuasive argument for entitlement for lost profits for the full ten years, as renewed, of the agreement, the Court determines that five years is the proper number of years to find this agreement would have continued. The Court so finds. As reflected on Defendants'/Counterplaintiffs' Exhibit 36a, MAI's projected profits range from $3,288,732 in year one to $4,937,870 in year five. After adjusting these amounts for the monies actually received by MAI, as reflected on Defendants'/Counterplaintiffs' Exhibit 36d, the present value of these amounts is $13,595,565. The Court finds that this amount reasonably represents the profits MAI would have earned over five years but for the GOA's bad faith.

132. As reflected on Defendants'/Counterplaintiffs' Exhibit 36a, SMG's projected profits range from $1,248,00 during the development phase, $1,376,196 in the first year of races to $4,937,870 in year five. After adjusting these amounts for the amounts paid by MAI to SMG during the project, as reflected on Defendants'/Counterplaintiffs' Exhibit 36a, the present value of these amounts is $6,917,061. The Court finds that this amount is reasonably represents the profits SMG would have earned over five years but for the GOA's bad faith.

### III. *Conclusions of Law*

The trial of this case has been governed, in large part, upon those portions of the Joint Pretrial Stipulation filed May 3, 2002

(D.E.No.142). In that document, the parties stipulated to a concise statement of Aruban Civil Code which they agree *shall* be binding in consideration of the legal issues in this case. A clear understanding of these Civil Code provisions and guiding principles of Aruban law, and the interpretation of these legal authorities, is *essential* to an understanding of this Opinion. The Stipulation of the parties as to Aruban law, is set forth at this point of this Opinion, prior to the Court's analysis of the legal issues it must determine. (Joint PreTr. Stip., pp. 26–32). It reads as follows:

## "VII. A Concise Statement of Issues of Law On Which There Is Agreement"

The parties agree that Aruban law applies to the substance of the tort and contract claims asserted by both Plaintiff and Defendants/Counter–Plaintiffs. The parties also agree that Aruban law applies to the remedies applicable to the tort claims asserted by both Plaintiff and Defendant/Counter–Plaintiffs, in the event that the Court determines there is tort liability. The parties agree that Defendant/Counter–Plaintiffs' Count V is a tort claim for purposes of these choice of law rules. The parties disagree about whether the remedies applicable to the contract claims asserted by both Plaintiff and Defendant/Counter–Plaintiffs, in the event that the Court determines there is contract liability, are governed by Aruban law or Florida law.

The parties to this Stipulation have also agreed on the following principles of Aruban law. The following is not intended as a complete statement of applicable Aruban law and additional legal principles of Aruban law may apply; however, the parties differ as to the substance of those additional legal principles. Any such additional legal principles will be presented to the Court for resolution, and each party may present to the Court additional legal materials concerning Aruban law with translations of the cases or statutes relied upon.

1. When negotiating a contract, parties enter into a relationship dominated by the principles of reasonableness and fairness, which imposes on each of them the duty to take into account the other's reasonable interests. These principles of reasonableness and fairness require that a party should not lead his negotiating partner to believe that there is still a chance of concluding a contract, when there is not, and a party should be clear on his viewpoints and his breaking points.

2. Under certain circumstances, the precontractual principles of reasonableness and fairness can lead to an obligation to pay damages to the ex-negotiation partner when one breaks off negotiations. There are three states on the negotiation process:

 a. Initial stage: the parties are free to break off negotiations without any obligation to compensate the other party;

 b. Continuation stage: a party is still free to break off negotiations, but only when he compensates the other party for all or some of the expenses made;

 c. Final stage: a party is no longer free to break off negotiations. If he nevertheless does so, he is obliged to compensate the other party for expenses and, in some cases, for the profits the other party would have made.

These rules also apply when parties assume that they have concluded a contract and for whatever reason it becomes apparent that this is not the case.

3. The "continuation stage" begins when there is a realistic possibility that a contract will be concluded and continuation of the negotiations is therefore useful. Reliance on the conclusion of a contract should only be protected when it is considered to be justified and is caused by the party that breaks off the negotiations.

4. [The parties are presently working on an appropriate description of the "final stage," but are awaiting the receipt of translations of certain Dutch decisions before that description can be finalized].

5. Article 1330 of the Aruban Civil Code provides that an agreement is an act whereby one or more persons assume an obligation vis-a-vis one or more other persons. In order for an agreement to exist, four requirements need to be met that are imposed by Article 1337 of the Aruban Civil Code.

 a. consent by the person assuming the obligation;

 b. capacity to assume the obligation;

 c. a determined subject matter;

 d. a permitted cause.

6. The required "consent" implies that the parties must have manifested their intention to enter into an agreement towards each other by means of matching declarations of intention. A declaration of a party's intention can follow not only from explicit wording, but also from such party's conduct if such conduct is directed at reaching agreement.

7. Declarations of intention that together constitute "consent" can be subdivided into an "offer," on the one hand, and the "acceptance" on the other hand.

8. If the offer is followed by the acceptance thereof, an agreement is constituted.

9. "Consent" assumes two matching declarations of intention: offer and acceptance. It may, however, occur that a discrepancy exists between what a party declares and what such party intends. In such a case, it is generally held to be decisive whether the other party may trust that the declaration is in accordance with the actual intention. If parties use a term which can be misinterpreted in an agreement, whether an agreement was reached depends on what both parties have declared towards each other and what they have concluded from each others' declarations and conduct, in accordance with the meaning that they, given the circumstances of the case, could reasonably attach thereto; in that respect, the following may need to be taken into account:

 a. whether the interpretation that one party gave to the term is more likely than the interpretation given to it by the other party;

 b. whether, if the term has a fixed, technical meaning, the party that takes such meaning as a basis, could expect that the other party also knew such meaning;

 c. if the other party was assisted by experts and the counterparty could have expected such expert

to know the meaning of the term and inform its client on such meaning;

d. if one of the meanings given to the term by the parties would lead to a result that would not easily be consistent with what the parties intended by the agreement.

10. Under Aruban law, agreements can be nullified in case of mutual mistake as to material terms or facts, fraud or coercion.

11. Agreements entered into under the influence of mutual mistake as to material terms or facts, fraud or coercion are voidable. This means that if a party refrains from invoking such annulment of the agreement, the agreement remains in effect.

12. Under Aruban law, a contract must be performed in accordance with its terms and in good faith. In case of breach of a contract, damages foreseen or reasonably foreseeable at the time of contract may be recovered.

13. Articles 1355 and 1359 of the Aruban Civil Code provide:

*Article 1355:*

1. "All legally made agreements are the law for those who have concluded them.

2. They cannot be revoked other than by mutual consent or for reasons that the law declares sufficient.

3. They must be performed in good faith."

*Article 1359:*

"If the words of an agreement are clear, one may not deviate from them by way of interpretation."

14. If a contract is concluded, the parties have to perform their obligations under it in good faith. A contract imposes on both parties the obligation to act with proper regard for the interests of its contract partner.

15. Article 1264 of the Aruban Civil Code imposes a limitation on the damages recoverable:

"The debtor is obliged to pay compensation for costs, damages, and interest that he did foresee or reasonably could foresee at the time the contract was made, unless it is his fraud that caused the non-performance of the obligation."

16. In a case of fraud, the only limitation on the compensation due is that of causality. Article 1265 of the Aruban Civil Code provides:

"Even if the non-compliance with the obligation is due to the fraud of the debtor, the compensation for costs, damages and interest, insofar as concerns the losses suffered and the profits foregone by the creditor, comprehend only what is the immediate and direct result of the non-performance of the obligation."

17. If particular conduct constitutes a breach of contract and also a tort, under certain circumstances the injured party has both a breach of contract and a tort claim. These circumstances exist when the act in question constitutes an unlawful act (as described below) regardless of the contractual provision it may have violated. In other words, there is tort liability based on an act if the act would have been unlawful even if the contractual obligation did not exist. Under no circumstances, however

may a party recover more than once for the same damages.

18. Under Aruban law, liability for negligent misrepresentation is governed by the general provisions of the Aruban Civil Code relating to torts. Articles 1382 and 1383 provide:

*Article 1382:*

"Each unlawful act, by which damage is inflicted on another person, renders the person whose fault has caused that damage liable to pay compensation therefore."

*Article 1383:*

"Anyone is liable not only for the damage that he has caused by his act, but also for what his failure to act or his imprudence has caused."

19. A constant line of cases, beginning in 1919, has interpreted the term "unlawful" in Article 1382 to encompass not only acts that violate statutes, but any act or omission that is contrary to prevailing notions of proper conduct. This open-ended definition has enabled Dutch and Aruban courts to impose liability in tort for conduct that, although not specifically addressed by statute, is deemed unacceptable in social intercourse.

20. The damages recoverable under Aruban tort law are described in Article 1264 of the Aruban Civil Code. As stated in Article 1264, they are the damages that were foreseen, or could reasonably have been foreseen, at the time the tort was committed.

Applying the foregoing law of Aruba to the facts of this case, this Court now makes its conclusions of law in deciding the issues raised by the GOA's Second Amended Complaint and MAI's and SMG's Second Amended Counterclaim. Each will be considered in turn.

**The Government of Aruba's Claims**

133. Count I of the GOA's Second Amended Complaint is a claim for fraud against Mr. Sanchez, MAI and SMG. It asserts that all three defendants made intentional and material misrepresentations of fact to the GOA and that the GOA relied on these misrepresentations in providing a letter of comfort to CMB backing CMB's bank guarantee. It claims that it has lost US$600,000 pursuant to this letter of comfort. It has also asked this Court to determine that it is entitled to recover any amounts which it is obligated to pay to CMB in a lawsuit which is presently pending in Aruba. The Court granted Defendants'/Counterplaintiffs' motion pursuant to Fed.R.Civ.P. 52(c) as to this element of damages. As a result, only the US$600,000 claimed loss is at issue in this case.

134. On this claim, the GOA primarily asserts that these defendants falsely represented that the matters listed on the "projected budget" attached to Mr. Yanowitch's July 21, 1999 letter represented the projected amounts which MAI would pay to the various sanctioning organizations, rather than the amounts which Colorado Hills would pay to MAI for obtaining those sanctioning agreements, and that the GOA properly relied on this misrepresentation.

135. The GOA's foreign law submissions to the Court acknowledge that in order to state a claim for fraud under Aruban law, there must be some sort of "trickery" as well as an intention to deceive. "Trickery" consists of "behavior which is aimed to create, confirm or inten-

sify a false impression." In addition, the parties' pretrial stipulation acknowledges that a claim for fraud under Aruban law requires proof of causation, which, in the context of fraud, means that the plaintiff reasonably relied on the allegedly fraudulent statements and suffered monetary loss as a result of that reliance.

■ 136. The Court rejects the GOA's fraud claim for a number of reasons. First, the Court concludes that there was no intent on the part of Mr. Sanchez to defraud the GOA. The "projected budget" was not created for the purpose of transmitting it to the GOA. Moreover, by its terms, it relates to preliminary figures, for agreements not yet signed, with prospective sanctioning organizations, pursuant to MAI's anticipated agreement not yet signed, with a company (ARUCO) not yet formed. The tentative language used forecloses the claimed issue, namely; that it was included with intended to defraud. Having observed the demeanor of the witnesses, the Court concludes that, although the language used in the "projected budget" is poorly phrased, Mr. Sanchez and his companies did not intend to defraud the GOA.

■ 137. Second, the Court concludes that the GOA did not, as a matter of fact, rely on the "projected budget" when it agreed to issue its letter of comfort to the Caribbean Mercantile Bank, or at any other time. Prime Minister Eman never received or read Mr. Yanowitch's letter or the "projected budget." He did not have any conversations with Finance Minister Tico Croes or anyone else about the letter or "projected budget." With respect to the "projected budget," he acknowledged that "I didn't really pay attention, not then and not before that." (5/21 Tr.Trans. at

133). Finance Minister Croes, who did receive the letter, reviewed both the conditions set forth in the letter under which MAI would be entitled to draw funds from CMB and the "projected budget." However, he had no clear understanding of the conditions set forth in the letter under which MAI would be entitled to draw funds from CMB and was unable to explain how those express conditions had anything to do with the "projected budget." Indeed, he conceded that the express conditions set forth in the letter under which MAI would be entitled to draw funds from CMB made no mention whatsoever of the "projected budget." When CMB raised issues as to whether MAI was entitled to draw on the CMB bank guarantee, Prime Minister Eman called Lionel Capriles, the Chairman of Caribbean Mercantile Bank's parent company, late at night, waking him, and demanded that CMB release the funds to MAI, *regardless* of whether MAI's draw request was proper or not, clearly establishing no reliance on the "projected budget" by the Prime Minister.

138. In addition, the GOA's lack of reliance is established by the fact that it never required, as a condition to any payment to MAI under the CMB Bank Guarantee or the GOA letter of comfort to CMB, that the payments to MAI from CMB correspond to the numbers and categories contained on the "projected budget;" that it be provided with the sanctioning and financial agreements between MAI and the sanctioning organizations so that it could compare those agreements with the "projected budget;" or that it be provided with the agreement between MAI and Colorado Hills so that it could determine that this agreement as well was consistent with the "projected budget." Instead, in this regard the GOA only required that as a

condition to payment that the MAI invoices be approved by the Managing Director of Colorado Hills. These approvals were given by Managing Director Mansur.

139. Third, any claim of reliance by the GOA on the "projected budget" is undermined by the fact that the GOA had no right to rely on that document in agreeing to provide CMB with its letter of comfort. The GOA's obligation in the Letter of Intent to make its capital contribution was not contingent on a projected budget from MAI as to how the monies drawn from the CMB bank guarantee were to be used by MAI. Instead, the GOA was obligated under the Letter of Intent to "provide whatever is necessary to assist ARUCO (Colorado Hills)" in obtaining a letter of credit to make payment to MAI; this obligation to do "whatever is necessary" was not contingent on a budget.

140. As is clear from these documents, the GOA's obligation was to do "whatever is necessary to assist" Colorado Hills. Pursuant to the Letter of Intent, the CMB bank guarantee (the terms of which were agreed to by the GOA in its July 22, 1999 letter of comfort to CMB), and the GOA's July 22, 1999 letter agreement with Colorado Hills, the GOA recognized and agreed that Carlo Mansur, as the Managing Director of Colorado Hills, had the authority to decide whether and how to spend the funds backed by the CMB bank guarantee and the GOA's letter of comfort. Mr. Mansur approved each and every invoice submitted by MAI seeking payment for services rendered and authorized their submission to CMB for payment. The documents did not require any correlation between these payments and any "projected budget."

141. Fourth, the GOA was not damaged as a result of its purported reli-

ance on the "projected budget." The Letter of Intent required the GOA to put up $3 million as its equity contribution in Colorado Hill. This obligation was not conditioned on any "projected budget." On September 6, 1999, Mr. Mansur, as Managing Director of Colorado Hills, directed all of Colorado Hills shareholders, including the GOA, to put up 50% of their capital contribution. (Def.Ex. 143). Thus, as of September 6, the GOA was obligated to put up $1,500,000. But the GOA did not make any such capital contribution, separate and apart from the letter of comfort it issued to CMB. Its present claimed loss on that letter of comfort of $600,000 is less than the $1,500,000 it would otherwise have been required to contribute to Colorado Hills.

142. Finance Minister Croes recognized that there could be no real loss to the GOA, on the letter of comfort it issued to CMB, since any amounts it would be required to pay on the letter of comfort merely represented its equity contribution to Colorado Hills, which it was required to make. Thus, in an October 14, 1999 memo (Def.Ex.148) describing the GOA's risk on the CMB letter of comfort as "minimal," he explained:

> If the counter-guarantee [the GOA's letter of comfort to CMB] were invoked, this amount is an advance payment of the Country on the share to be paid in the capital stock of Colorado Hills N.V., and the amount will be settled with the intended participation of the Country for the amount of US$ 3 million.

143. The GOA was not harmed as a result of any purported reliance on the "projected budget" for another reason as well. MAI had fulfilled its obligations and obtained guarantees from the United States racing organizations to stage races

in Aruba. The GOA wanted to bring at least four United States sanctioned races to Aruba per year for no more than $4,250,000, for which the GOA's share would be no more than US$3,000,000. It did not matter if MAI made a profit of $1 or $2,500,000, as long as the four races came to Aruba and amount of money required to procure those races would be no more than $4,250,000. As Prime Minister Eman acknowledged, he "wanted to make sure that for that $3 million the Government of Aruba would get races to Aruba." (5/21 Tr.Trans. at 121).

144. Finally, the Court relies on the fact that Mr. Mansur—by far the largest investor in the racetrack project, who obligated himself to CMB for the total debt of US$4,500,000, who contributed approximately an additional US$600,000 cash to Colorado Hills for working capital, and whose father pledged US$1,000,000 as collateral to CMB, (which collateral has been called and paid to Caribbean Mercantile Bank) testified that Mr. Sanchez and his companies committed no fraud and fulfilled their obligations to the racetrack project. He further stated that the GOA breached its obligation to Mr. Sanchez and his companies and caused the failure of the racetrack project. Mr. Mansur and his family had the most substantial cash investment in the project of any of the partners. The Court finds his testimony credible and persuasive.

█ 145. The GOA also claims that Mr. Sanchez and his companies committed fraud by failing to disclose that its $200,000 "equity contribution" was funded from the money it received from CMB. The Court rejects any such claim. The Court finds that any such "failure to disclose" was not intended to defraud. The Court also finds that the GOA did nothing

in reliance on any such "failure to disclose." Finally, the Court finds that Mr. Sanchez at all times had the ability to pay this $200,000 equity contribution regardless of any receipt of funds from CMB. As a result, the fact that this $200,000 equity contribution can be physically traced to funds received from CMB is essentially meaningless.

█ 146. Finally, the GOA contends that Mr. Sanchez made an intentional and material misrepresentation of fact by representing that the sanctioning bodies required his personal guarantee. The Court rejects this argument. Some of the sanctioning bodies in fact required personal guarantees from Mr. Sanchez; the representation was not false. Indeed, as set forth in the testimony of Minister Junior Croes, the GOA understood that the guarantees discussed by Mr. Sanchez were both personal and corporate. (5/28 Tr. Trans. at 46–48). Moreover, the drafts for the letter of comfort, submitted by Mr. Sanchez to the GOA so that the GOA could fulfill its promises to him, made clear that the purpose of the letter of comfort was to protect MAI from its corporate exposure. Indeed, the very first draft of the letter of comfort, submitted to the GOA in late July, 1999, stated, as the reason for its issuance, that "[b]y executing such agreements [with the sanctioning bodies] MAI shall expose itself to substantial liability ..." (Def.Ex.152). As a result, the GOA knew that the purpose of the letter of comfort was not just to protect Mr. Sanchez from personal liability, but also to protect MAI from potential liability. Thus, the Court concludes that the GOA did not rely on any representation regarding personal liability.

147. Count II of the GOA's Second Amended Complaint is a claim for breach

of contract based on Mr. Yanowitch's July 21, 1999 letter, which the GOA calls the "MAI Agreement." According to the GOA, this letter constitutes an enforceable contract between the GOA and MAI, and that MAI breached this contract by providing false invoices to Colorado Hills, as a result of which MAI obtained amounts from CMB (and therefore Colorado Hills) to which it was not entitled. The GOA also claims that the court should "pierce the corporate veil" between MAI and Mr. Sanchez, holding Mr. Sanchez liable for any such breach of contract as well.

148. At the outset, the Court rejects the argument that the GOA is entitled to hold Mr. Sanchez liable for MAI's obligations under the theory of "piercing the corporate veil." The GOA contends that the corporate veil should be pierced because Sanchez dominated and controlled MAI, failed to observe corporate formalities and MAI was not adequately capitalized. The law does not support the GOA's attempt to pierce the corporate veil. Under Florida law, as exemplified in *Dania Jai-Alai Palace, Inc. v. Sykes*, 450 So.2d 1114 (Fla.1984), courts are reluctant to pierce the corporate veil and will do so only in exceptional cases where there has been extreme abuse of the corporate form. *Resolution Trust Corp. v. Latham & Watkins*, 909 F.Supp. 923, 930–32 (S.D.N.Y.1995)(collecting cases). A plaintiff seeking to pierce the corporate veil bears a very heavy burden. *Id.* at 930; *Hillsborough Holdings Corp. v. Celotex Corp.*, 166 B.R. 461 (Bankr.M.D.Fla.1994), *aff'd*, 176 B.R. 223 (M.D.Fla.1994). "[E]ven if a corporation is merely an alter ego of its dominant shareholder or shareholders, the corporate veil cannot be pierced so long as the corporation's separate identity was lawfully maintained."

*Lipsig v. Ramlawi*, 760 So.2d 170, 187 (Fla. 3d DCA 2000). It is insufficient that a shareholder operated a wholly-owned corporation in a "loose and haphazard manner;" the corporation did not observe corporate formalities, had no capitalization, and the sole shareholder exercised complete control. *Resolution Trust*, 909 F.Supp. at 931 (citing *Hilton Oil Transp. v. Oil Transp. Co.*, 659 So.2d 1141, 1152, 1153 (Fla. 3d DCA 1995)). Under Florida law, to pierce the corporate veil a plaintiff must show that the corporation was organized or employed as a mere device or sham to work a fraud on creditors. *Johnson Enter. of Jacksonville, Inc. v. FPL Group, Inc.*, 162 F.3d 1290, 1320 (11th Cir.1998); *U–Haul Int'l, Inc. v. Jartran, Inc.*, 793 F.2d 1034, 1043 (9th Cir.1986); *Resolution Trust*, 909 F.Supp. at 931–32; *Keys Jeep Eagle, Inc. v. Chrysler Corp.*, 897 F.Supp. 1437, 1442 (S.D.Fla.1995); *Dania Jai–Alai*, 450 So.2d at 1120–21. Domination and control and undercapitalization are insufficient to meet the improper conduct requirement. *Resolution Trust*, 909 F.Supp. at 932. Thus, in *U–Haul Int'l v. Jartran*, the Ninth Circuit reversed the district court's finding that James Ryder and Jartran were alter egos, despite "ample evidence that Mr. Ryder controlled Jartran and that he subsidized it heavily." 793 F.2d at 1043. Here, while Sanchez may have controlled MAI, the GOA has not carried its burden of proof to establish that MAI was organized, or utilized, as a mere device or sham to work a fraud on creditors.

149. The evidence does not establish the Plaintiff's alleged breach of contract claim against MAI. The July 21, 1999 letter set forth the procedures under which funds would be drawn from the CMB bank guarantee and were incorporat-

ed in the CMB bank guarantee issued the next day. The Letter of Intent, signed by the GOA and MAI, among others, three weeks earlier already obligated the GOA to do "whatever is necessary to assist ARUCO (Colorado Hills) in obtaining a letter of credit or bank guarantee for the benefit of MAI."

150. The evidence establishes and the Court concludes that MAI did not submit false invoices to Colorado Hills in breach of any purported agreement contained in the July 21, 1999 letter. The invoices were not false. Each of the invoices for the sanctioning agreements represented on its face that it was for services rendered by MAI, including for services in obtaining the various agreements with the sanctioning organizations and for securing commitments from those organizations for a racing event date. Each was for an agreement which MAI had actually obtained from the particular sanctioning organization to which the invoice referred. Each was for an amount to which MAI was entitled under the provisions of the Colorado Hills Agreement.

151. In addition, the Court cannot look to the July 21, 1999 letter in isolation. Instead, it must be viewed together with the Letter of Intent, the CMB bank guarantee, the form of which was approved by the GOA in its July 22, 1999 letter of comfort to CMB, and the GOA's July 22, 1999 letter agreement with Colorado Hills. When so viewed, it is clear that the GOA recognized and agreed that Carlo Mansur, as the Managing Director of Colorado Hills, had the authority to decide whether and how to spend the funds backed by the CMB bank guarantee and the GOA's letter of comfort. In fact, Finance Minister Croes testified that Mr. Mansur was given authority under the GOA's agreement to approve or disapprove the invoices. (5/22 Tr.Trans. at 22). Mr. Mansur approved each and every invoice submitted by MAI seeking payment for services rendered and authorized their submission to CMB for payment. With respect to the invoice for driver appearance fees, event personnel and other expenses, the July 21, 1999 letter merely required approval of the invoice by Mr. Mansur, as Managing Director of Colorado Hills. Nothing in the July 21, 1999 letter prohibited MAI from billing for those expenses in advance, so long as the invoice was approved by Mr. Mansur. MAI did not submit false invoices in violation of the July 21, 1999 letter, but instead submitted appropriate invoices, which were properly approved by Mr. Mansur on behalf of Colorado Hills, as contemplated by the parties' agreements.

152. Count III of the GOA's Second Amended Complaint alleges that MAI and SMG breached the Letter of Intent by failing to deposit the full equity contribution required of SMG, by imposing additional conditions for its deposit of such equity contribution; and on the part of MAI, by failing to issue a guarantee back to the GOA pursuant to the Letter of Intent, assuring the GOA that MAI would obtain the required agreements with the sanctioning bodies. With respect to deposit of its equity contribution and the imposition of conditions with respect to that deposit, the Court concludes that Mr. Sanchez was at all times ready, willing and able to deposit SMG's full equity contribution. In fact, Mr. Sanchez actually tendered a check for his remaining equity contribution to Mr. Mansur, as Managing Director of Colorado Hills. Mr. Mansur refused to accept the check, however, because of the significant sums of money which Colorado Hills owed to Mr. San-

chez's company, SMG. (5/31 Tr.Trans. at 94). Mansur testified that he refused tender of MAI check "[b]ecause I didn't feel it was fair to Mr. Sanchez given that ... [w]e were due to him approximately $700,000 at that point in time." Moreover, as detailed herein, the GOA had failed to carry out the prior promises which it had made to Mr. Sanchez with respect to providing him with a letter of comfort. Further, with respect to MAI's guarantee that it would obtain the required sanctioning agreements, the Letter of Intent specifically stated that "legal counsel for the parties will jointly draft agreements setting forth the details of these arrangements." This was never done. The GOA never submitted any such agreement to Mr. Sanchez, MAI or SMG for its execution. In any event, any such guarantee became moot when Mr. Sanchez actually obtained those agreements, shortly after execution of the Letter of Intent, and brought the sanctioning bodies' executives to a press conference in Aruba where they publicly recognized that the sanctioning bodies were committed to bring their races to Aruba. There was no proof offered that the GOA was damaged as a result of this alleged breach.

■ 153. Count IV of the GOA's Second Amended Complaint seeks damages against Mr. Sanchez, MAI and SMG for breach of the duty of good faith and fair dealing under Aruban law. The parties do not dispute that each owed the other a duty of good faith and fair dealing under Aruban law, the breach of which gives rise to a tort claim for damages. Indeed, the crux of this case is whether the GOA, on the one hand, or Mr. Sanchez and his companies, on the other hand, breached this duty of good faith.

154. In Count IV, the GOA claims that Mr. Sanchez, MAI and SMG breached this duty of good faith by submitting false invoices to Colorado Hills, causing payments to be made to MAI by CMB for amounts to which MAI was not entitled. For the reasons stated above, neither Mr. Sanchez, MAI nor SMG breached any duty in this regard; under all of the agreements between the parties and the agreements between the GOA, Colorado Hills and CMB, the invoices they submitted to Colorado Hills were proper, and were properly approved by Colorado Hills for submission to CMB for payment. Mr. Sanchez, MAI and SMG did not breach any duty of good faith to the GOA. Indeed, as detailed at length below, the GOA breached the duty of good faith which it owed to Mr. Sanchez and his companies.

■ 155. Count V of the GOA's Second Amended Complaint seeks a constructive trust of the monies received by MAI from CMB. Because those payments were properly made by CMB to MAI, no such constructive trust is appropriate. In any event, because a constructive trust is an equitable remedy, it is not available when there is an adequate remedy at law. *Stillwell v. Kent,* 94 Fla. 1176, 115 So. 508 (1928). *See Rosen v. Cascade Int'l, Inc.,* 21 F.3d 1520, 1527 (11th Cir.1994) (equitable relief only available where there is no adequate remedy at law). *See also Bender v. CenTrust Mort. Corp.,* 51 F.3d 1027, 1030 (11th Cir.1995). In this case the GOA seeks money damages. "Cases in which the remedy sought is the recovery of money (whether as collection on a debt or as damages) do not fall within the jurisdiction of equity ... and the imposition of a constructive trust will generally not be the appropriate remedy." *Id.* (ellipses by court). Here, the GOA has an adequate remedy at law, albeit one which it has failed to prove. Finally, a constructive

trust cannot be imposed on the defendant's general assets. *Abele v. Sawyer*, 750 So.2d 70, 74 (Fla. 4th DCA 1999). It can only be imposed if the property wrongfully transferred is specific and identifiable in the hands of the defendant. That is simply not the case where, as here, the plaintiff merely seeks the recovery of money. *Bender, supra.*

156. Finally, the Court notes that the GOA's trial memorandum purports to set forth a claim for rescission of the Letter of Intent or, in other words, a "rescission" of the entire racetrack project. No such claim was set forth by the GOA in its Second Amended Complaint. This claim was first made by the GOA on the eve of trial in its motion to amend the Second Amended Complaint. The Court denied that motion because of its lateness. It denies the GOA's current request for the same reason.

▮▮▮▮ 157. Moreover, as the GOA acknowledged in the pretrial stipulation, under Florida conflicts law, Florida substantive law governs remedy issues in contract actions. *See Gregg v. U.S. Industries, Inc.*, 887 F.2d 1462, 1465 n. 1 (11th Cir.1989); *Automated Med. Lab., Inc. v. Armour Pharmaceutical Co.*, 629 F.2d 1118, 1122 n. 3 (5th Cir.1980); *Zim v. Western Pub. Co.*, 573 F.2d 1318, 1326 n. 15 (5th Cir.1978); *Goodman v. Olsen*, 305 So.2d 753 (Fla.1974); *Wingold v. Horowitz*, 292 So.2d 585 (Fla.1974). Under Florida law rescission is a harsh remedy which lies within the sound discretion of the court and is not available as a matter of right; a party seeking rescission must show, *inter alia*, that he has rescinded the contract and notified the other party of such rescission, has offered to return any benefits from the contract and has no adequate remedy at law. *Billian v. Mobil*

*Corp.*, 710 So.2d 984, 990–91 (Fla. 4th DCA 1998). The GOA has made no such showing here.

▮▮▮▮ 158. In addition, "Florida law provides for an election of remedies in fraudulent inducement cases: rescission, whereby the party repudiates the transaction, or damages, whereby the party ratifies the contract." *Mazzoni Farms, Inc. v. E.I. DuPont De Nemours & Co.*, 761 So.2d 306, 313 (Fla.2000). A party's right to rescind is subject to waiver. *Id.; Rood Co. v. Board of Pub. Instruction*, 102 So.2d 139, 141–42 (Fla.1958). A party who discovers fraud in the making of a contract must promptly notify the other party of his election to rescind or he loses the right to rescind and is limited to the remedy of damages. *City of Del Rio v. Ulen Contracting Corp.*, 94 F.2d 701, 703 (5th Cir. 1938); *Brite v. W.J. Howey Co.*, 81 F.2d 840, 841 (5th Cir.1936); *McCormick v. Lewis*, 102 F.Supp. 624, 626 (N.D.Fla. 1952). As the Florida Supreme Court held in *Rood*,

it is not enough that one claiming recision ... allege merely that there was a mistake of material fact. He must also ... show that such mistake did not result solely from the want of care and diligence on his part .... Further, he must ... show that upon discovery of the mistake he, with reasonable promptness, denied the contract as binding upon him and that thereafter her was consistent in his course of disavowal of it. For if, after acquiring knowledge of the mistake, he either remains silent when he should speak or in any manner recognizes the contract as binding upon him, ratifies or accepts the benefits thereof, he will be held to have waived his right to rescind. Thereafter, he will be bound by the contract in the same

manner as if the mistake of fact had not occurred. 102 So.2d at 141–42.

Thus, rescission will not be granted unless it is clear that the claimant is entitled to it and has not waived his right; slight circumstances indicating waiver will bar the relief. *Id.* at 142. Here, the GOA has failed to meet the requisites showing entitlement to rescission and did not attempt to raise this issue until late in this litigation; it has thus waived any claim for rescission based upon fraud or mistake.

159. Finally, any claim for rescission does not affect the outcome of this case. Because, as detailed below, the Court finds that the GOA breached its precontractual duty of good faith under Aruban law, rescission of the Letter of Intent, or any other agreement, is immaterial since the GOA's breach of that precontractual duty of good faith exists whether or not the Letter of Intent or any other document constitutes a binding contractual obligation.

### MAI's and SMG's Claims

160. In their Second Amended Counterclaim, MAI and SMG have asserted claims for Breach of Contract (Count I), Negligent Misrepresentation (Count II), Breach of Fiduciary Duty (Count III), Breach of the Letter of Intent (Count IV) and Breach of the Precontractual Duty of Good Faith, cognizable under Aruban and Dutch law. (Count V).

161. As detailed in the findings of fact, the Court has concluded that the GOA made numerous assurances and promises to Mr. Sanchez and his companies regarding the financial support which the GOA would provide. The parties have disputed whether these assurances or promises rise to the level of binding contractual obligations so as to give rise to a claim for

breach of contract under Count I. MAI and SMG assert that even if these assurances or promises do not rise to the level of binding contractual obligations, the GOA's bad faith conduct with respect to those assurances or promises constitutes a breach of the GOA's precontractual duty of good faith under Aruban law, giving rise to liability under Count V, a breach of the GOA's duty of good faith under the Letter of Intent, giving rise to liability under Count IV, or a breach of the duty of good faith which the GOA owed to SMG and MAI as joint venturers, giving rise to liability under Count III. Because these issues of whether the GOA acted in good faith are at the core of SMG's and MAI's claims, the Court turns to them first.

162. Count V asserts a claim by MAI and SMG against the GOA for breach of the precontractual duty of good faith which exists under Aruban and Dutch law. The nature of this claim is unique to Aruban and Dutch law; it has no direct counterpart under the law of Florida.

163. The parties have stipulated to the elements of this claim in their Joint Pretrial Stipulation. As recognized in that stipulation, under Aruban law, one party may be held liable to another for unfair or unreasonable conduct during negotiations leading towards a contract, even where no contract is ever culminated. As recognized in ¶ 1 of the Agreed Statement of Issues of Law, contained in the Joint Pretrial Stipulation (pp. 56–60 *supra*), the applicable Aruban law provides:

> When negotiating a contract, parties enter into a relationship dominated by the principles of reasonableness and fairness, which imposes on each of them the duty to take into account the other's reasonable interests.

Under certain circumstances, this precontractual duty of reasonableness and fairness can obligate one negotiating party to pay damages to the other negotiating party. *Id.* at ¶ 2. The obligation to pay damages depends on the stage at which the negotiations are terminated. At the "initial stage," the parties are free to break off negotiations without any obligation to compensate the other party. *Id.* at ¶ 2(a). At the "continuation stage," a party is still free to break off negotiations, but only when he compensates the other party for all or some of its expenses. *Id.* at ¶ 2(b). At the "final stage," a party is no longer free to break off negotiations. If he nevertheless does so, he is obliged to compensate the other party for expenses and, in some cases, for the profits the other party would have made. *Id.* at ¶ 2(c).

164. The critical issue in this case therefore becomes whether, on April 28, 2000, the "negotiations" between the GOA, on the one hand, and Mr. Sanchez, SMG and MAI, on the other hand, were still in the "initial stage," when the GOA could effectively terminate the motorsports raceway project without any financial obligation to SMG and MAI, or whether instead, the negotiations had reached the "continuation stage" or the "final stage" by that date, when the GOA could not terminate its involvement in the project without incurring liability to SMG and MAI.

 165. The parties have stipulated when the "continuation stage" begins under Aruban law. "The 'continuation stage' begins when there is a realistic possibility that a contract will be concluded and continuation of the negotiations is therefore useful." *Id.* at ¶ 3. Moreover, a party's reliance that a contract will be concluded is protected only when "it is considered to be justified and is caused by the party that breaks off the negotiations." *Id.* at ¶ 3.

166. The parties have also stipulated that the "final stage" occurs

when it can be established that if negotiations had not broken off, but instead had continued in good faith by all parties, the parties would have entered into the contract they were contemplating and the disappointed party justifiably believes that a contract would have resulted from such continued negotiations. However, the justifiable belief of the disappointed negotiating party is not always enough to result in liability against the party that breaks off negotiations. One also must consider (i) the extent to which and how the party that breaks off the negotiations has caused that justifiable belief; (ii) the just interests of the party that broke off the negotiations, and (iii) whether any unforeseen circumstances have arisen during the negotiations which justify breaking off negotiations.

Supplemental Stipulation of Law, filed on May 15, 2002. (D.E.Nos.149,150).

 167. The Court concludes that the factual evidence at trial clearly establishes that negotiations between the parties in this case reached the "final stage." Mr. Sanchez "justifiably believe[d]" that final agreements leading to the construction of the racetrack project would occur, on July 28, 1999, when the GOA's Prime Minister told Mr. Sanchez to move forward with the project and execute agreements with the sanctioning organizations; on August 4, 1999, when the GOA represented in writing that it "intend[ed] to remain a shareholder in Colorado Hills for a period of at least five years;" on September 28,

1999, when Mr. Sanchez held an international press conference at the insistence of Prime Minister Eman, at which Prime Minister Eman announced the GOA's support for the project; on October 18, 1999 when the Aruban Parliament passed a "Mocion" approving the issuance of letters of comfort and which, in the words of Mr. de Meza, the GOA's representative to the project, made the project a "done deal;" March 27, 2000, when, following a presentation to Parliament, Prime Minister Eman told Mr. Sanchez, in the presence of representatives of the sanctioning organizations and numerous GOA officials, that the GOA would provide a guarantee of construction financing and that the project will proceed immediately; and on April 23, 2000, when Mr. Sanchez and the other investors agreed in writing to contribute $12 million in equity in response to Prime Minister Eman's express statement that the GOA would then issue a $15 million construction guarantee.

168. Moreover, the Court concludes that the racetrack project would have continued, and the racetrack would have been constructed, if the GOA had acted in good faith. The Court need look no further than the testimony of Prime Minister Eman. Prime Minister Eman arranged for a presentation to Parliament on March 27, 2000 to consider the GOA's guarantee of construction financing. He stated in his testimony that "we got the support of Parliament for a guarantee of $15 million for the construction of the racetrack." (5/22 Tr.Trans. at 30). He also acknowledged that immediately following that presentation, at a gathering in his office, he "assured" Mr. Sanchez, the representatives of the sanctioning organizations, and others, that "the government would go forward with the construction of the project and the issuance of a guarantee." (5/22 Tr.

Trans. at 30). He testified that, by that time, the new environmental study had been completed, all environmental concerns had been addressed and "that the racetrack project could continue." (5/22 Tr.Trans. at 31). He conditioned the government's commitment to give a $15 million construction guarantee on the investors' commitment to invest $12 million in equity. Finally, the evidence establishes that pursuant to the Prime Minister's request, the investors committed in writing to provide $12 million in equity.

169. The Court finds that the racetrack project did not go forward, however, not because of any failures on the part of Mr. Sanchez, his companies or the other investors, but because of the conditions imposed by Finance Minister Croes' April 28, 2000 letter. This letter is discussed at length in this Court's findings of fact. As detailed in those findings, the conditions of that letter, including the removal of Mr. Mansur and the effective removal of Mr. Sanchez and his companies, conditions which had never been previously mentioned, were so extensive, unreasonable and onerous, that it was patently obvious that the letter had been prepared and transmitted in bad faith and in a calculated effort to destroy the Aruba Motorsports Complex project. It constitutes a breach of the GOA's obligation under Aruban law to deal with Mr. Sanchez and his companies in good faith, entitling Mr. Sanchez's companies, MAI and SMG, to the profits they would have earned on the project.

170. This conclusion is supported by the leading decision from the Hoge Raad der Nederlanden, or Netherlands Supreme Court, in *Plas v. Municipality of Valburg*, 1983 Netherlands Jurisprudence 723. In that case, a contractor submitted a plan for the construction of a swimming pool to a

municipality. The plan was accepted by the municipalities' executive, but that acceptance was "subject to approval by the [Municipal] Council and subject to the adjustment of some details." When the matter was taken up by the Municipal Council, the council awarded the contract to another contractor. The lower appeals court held that termination of negotiations by the municipality obligated it to pay out of pocket expenses, but not damages. The Netherlands Supreme Court reversed:

> In its fourth legal consideration the Court of Appeal starts out from the legal rule that the obligation to pay compensation as a result of conduct that is in violation of the principle of good faith in a pre-contractual negotiation "does not extend beyond the costs incurred and the damage which the other party would not have incurred if the pre-contractual relationship had not come into existence" and that it can therefore not include compensation for the loss of profit. *Such a rule in general is not supported by the law.* It may well be possible that negotiations on an agreement have reached such a stage that the breaking off of such negotiations in itself must in the given circumstances be

viewed as being contrary to the principle of good faith, because both parties *were justified in trusting that in any case some contract would result from the negotiations.* In this kind of situation there can also be room for an obligation to compensate a loss of profit.[1]

Thus, under *Plas*, the negotiations reach the "final stage" when the parties were justified in trusting that some contract would result from the negotiations. The evidence clearly establishes that a contract would have resulted in this case but for the acts of the Government of Aruba. The GOA's breach of its obligation of good faith during this "final stage" requires it to pay damages, including lost profits, to SMG and MAI.[2]

171. This holding was applied to by the Joint Court of Justice of the Netherlands Antilles and Aruba and the Netherlands Supreme Court to a factually similar case involving Aruba which held the GOA liable for the justified expectations which were created from its promises in a commercial transactions. In *Aruba v. Trias and Lopez*, 1995 N.J. No. 704, the Joint Court of Justice of the Netherlands Antilles and Aruba and the Netherlands Supreme Court were confronted with a case similar

---

1. In a subsequent decision, the Netherlands Supreme Court recognized that it is not necessary that both parties justifiably belief that a contract would result, only whether the party claiming damage justifiably believed that a contract would result: "[I]t is, as a general rule, not relevant whether both parties could rely on the conclusion of the contract but only whether the counterparty of the party preventing the conclusion of the contract could rely on that." *Vogelar v. Skil Netherland, B.V.*, 1991 Netherlands Jurisprudence 647.

2. The applicable law concerning an action based on unfair and unreasonable conduct during precontractual negotiations, and the holding in *Plas* and related cases, is summarized in *Netherlands Antilles Business Law*

(1999). As explained in that text, the "final stage" is reached when negotiations "advance to the stage where the parties *should be able to trust that some sort of contract will be made.* Breaking off the talks at this stage (phase C) may, in the given circumstances, be regarded as unfair and unreasonable. And according to the Supreme Court's judgments, damages could be awarded in order to compensate for the positive interest [lost profits]." Thus, where negotiations have reached a stage "where the parties should be able to trust that some sort of contract will be made," unfair and unreasonable conduct on the part of one of the parties will obligate that party to pay damages, including lost profits.

to this one. There, Trias Resorts negotiated with the GOA to develop a recreation project. However, for the project to go forward, Trias needed the GOA to guaranty bank loans and grant it rights to certain parcels of water owned by Aruba. The Aruban Minister of Public Works informed Trias that the GOA would grant it both the water rights and the loan guaranties. The Aruban Parliament passed a motion approving the guarantees. However, the GOA failed to follow through; as in this case, it did not submit to Parliament the state ordinances or further measures which were necessary for the project to go forward. Both the Joint Court of Justice of the Netherlands Antilles and the Netherlands Supreme Court held that the developer was justified in expecting the necessary legislative measures to be passed and the GOA was liable for its failure to meet those justified expectations.

172. The Joint Court of Justice of the Netherlands Antilles and Aruba first explained the issue before it:

As indicated, this case is about the financing of the Laguna Dorada project and in particular the absence of a government guarantee for loans Trias would have to obtain to carry out the project. Under the provisions of the Constitution of Aruba ... a state guarantee for a loan requires a State ordinance ...

In the opinion of the first judge [the trial judge] Aruba acted unlawfully, namely:

-without due diligence, by waiting a long time to submit a draft State ordinance;

-and contrary to the principle of fair play by suggesting in the explanatory memorandum, in short, that the draft not be approved.

The Joint Court agreed with this holding:

In the opinion of the Court, through the actions of the Government and Parliament indicated in paragraph 3 of this ruling, Aruba created the legitimate expectation in Trias that a government guarantee would be provided.

The Court explained that the issue was not whether a court could compel issuance of the appropriate State ordinance, but whether the failure to pass the required State ordinance was "unlawful," i.e., in violation of its duty of good faith:

The point is precisely that no State ordinance came into being and—as the Court adds—that clearly no State ordinance will come into being either. Therefore there is no question of an assessment (or testing) of a State ordinance. The matter in question is not whether a judge may intervene in the legislative process, either, or whether he may instruct a legislator to bring a law into being. The subject of discussion is whether the failure to bring about a State ordinance in connection with Trias in light of the contacts between the parties was unlawful and whether Aruba is liable for damages on these grounds:

The Court rejected the argument that there could be no liability because it was Parliament, not the Government of Aruba, which failed to pass the required State ordinance:

Aruba did state that the Government had submitted a draft guarantee ordinance but—according to Aruba—the Parliament did not make a decision on this. This statement is part of the position that Aruba ·is not responsible for what Parliament does and does not do.

That misunderstanding must be dispelled; in the case of questions of unlawful legislation as well as unlawful non-legislation, the Government may indeed be responsible for the actions of the people's representatives.

Finally, the Joint Court rejected the Government's defenses, which are similar to the GOA's defenses here. The Court stated, in language fully applicable here:

In the explanation of the first complaint Aruba also stated that:

-the project met with environmental problems;

-the granting of State waters in leasehold was problematic;

-Trias did not have a feasibility report prepared;

-there were objections to the project, not only from "some Aruban fisherman" but also from the Advisory Council;

-with Trias the relationship between borrowed capital and shareholders' equity was ultimately unclear;

-the issuance of a guarantee for a restaurant business would be without precedent.

All these statements do not diminish that this is a question of a commitment to Trias by the Government and Parliament and of a resulting legitimate expectation created in Trias that a government guarantee would be granted. According to the general principles of sound administration—in particular the principles of legal certainty and legitimate expectations—Aruba is bound to honor such expectations.

173. The *Trias* matter was then appealed to the Netherlands Supreme Court. The Netherlands Supreme Court affirmed the decision of the Joint Court of the Netherlands Antilles and Aruba. The Supreme Court wrote:

Given this character of the commitment established to be unconditional by the Joint Court, there was no reason for the

Joint Court to initiate further research into the boundaries of the freedom, afforded firstly to Parliament, to change a chosen policy; that freedom does not after all bring with it that damages caused by the failure to honor an unconditional commitment would not have to be compensated.

174. The matter was remanded and on remand considered by the Common Court of Justice of the Netherlands Antilles and Aruba. On that remand, the parties—including the GOA—and the Court recognized that Trias was entitled, not only to out of pocket expenses, but to lost profits as well:

It is the purpose of these proceedings to determine any damage and/or loss sustained by Trias that is related to Aruba's non-fulfillment of the legitimate expectations relied on by Trias in respect of the issuance—for no consideration—of a state guarantee relating to the recreational project by the name of Laguna Dorada, and in respect of the creation of a real right relating to a parcel of seawater or bay bottom (for no consideration, as well), to such an extent that this non-fulfillment is imputable to Aruba, considering the nature of the liability and the damage and/or loss as a result of this non-fulfillment.

\* \* \* \* \* \*

Both parties assume that the present case justifies a compensation for loss of profits in respect of the Laguna Dorada project (known as the "positive interest"). The Court agrees with this in view of the special circumstances surrounding the present case. *For purposes of this assumption, a comparison should be drawn between the situation after the non-fulfillment of the expecta-*

*tions on the one hand and the situation that the parties would have faced, if Aruba had issued the state guarantee and established the real right on the other hand.*

175. The *Trias* decision does not stand alone. Another decision of the Netherlands Supreme Court involving Aruba reached the same result, again under similar facts. In *Felix v. Aruba*, 1992 Netherlands Jurisprudence 287, the airport commandant gave Felix's company permission to operate certain services at the airport. The company began the work necessary to perform those services. Thereafter, the GOA's Minister of Transport and Communications authorized solely another company to perform those services, to the exclusion of Felix's company. Felix sued for his out of pocket expenses and lost profits. The Court of First Instance awarded Felix his losses, including lost profits. Aruba appealed to the Common Court of Justice of the Netherlands Antilles and Aruba, which limited his damages and excluded lost profits. Again, the Netherlands Supreme Court reversed. First, it expressly determined that the airport commandant did *not* have authority to bind the GOA. It nevertheless concluded that the GOA was liable for Felix's lost profits, accepting the argument that

in the course of the negotiations, which were in an advanced state ... [Felix] had a right to rely on the airport commandant having the relevant power, and further, that in the circumstances, Aruba's breaking off these negotiations conflicted with the requirements of reasonableness and fairness which Aruba ought to have met vis-a-vis Felix, as a result of which Aruba is obligated to compensate Felix for the damage and/or losses he incurred, consisting in the

costs incurred by him as well as lost profits.

176. Here, as in *Trias* and *Felix*, the GOA made similar promises and gave similar assurances to SMG and MAI. Through those promises and assurances, it created similar legitimate expectations on the part of SMG and MAI. And, as in those cases, it is similarly liable under Aruban law for the profits SMG and MAI lost because of the GOA's failure to fulfill the legitimate expectations arising from its promises and assurances.

177. The Government of Aruba was completely aware of its responsibility under Aruban law for all the promises made to Defendants. Joe Maduro, the GOA's legal counsel at the time of the transactions at issue, admitted that he was aware of the *Trias* case and the GOA's liability for the justified expectations it raised, at the time of the GOA's involvement in this project, when the Letter of Intent was executed on July 1, 1999. (Maduro Deposition at 63–64). Franklin De Kort, the head of the GOA's Central Accounting Service, also acknowledged this liability on the part of the GOA. In analyzing the Letter of Intent involved in this case, he stated in a written memorandum (Def.Ex.270):

In point 8 of the LOI (the Letter of Intent) it is indicated that if the State receives no approval from Parliament, this LOI shall become null and void. In the *Trias* case there was ultimately no authorization from the Parliament for the issuance of a guarantee, but the State was still ordered to compensate for the damages sustained by Trias.

178. Any doubt in this regard is belied by the words of the GOA itself. Prior to this litigation, the GOA was sued in an Aruban court to stop the Motorsports

racetrack project. The GOA's defense of that suit and response to the court was clear. Not only did the GOA acknowledge that it had created legitimate expectations that the racetrack project would move forward, it also acknowledged that the project could not be stopped without compensation for these legitimate expectations. As the GOA stated to the Aruban court, through its counsel:

> [T]he government has granted a temporary license and its commitment to the project developer that the leasehold property required for the project, the final licenses and further necessary facilities will be granted ...

> \* \* \* \* \* \*

> ... [A]ccording to the prevailing conception of law, it is allowed that the government, pending the issuance of definite licenses, gives a temporary license to a project developer ... It is required that the application for the license must be submitted, and that it is plausible and probable that the license will be granted and that the government has properly considered the interests involved for granting the license.

> \* \* \* \* \* \*

> The Country is by no means obliged, now that it has already obtained official advice from VROM [the government environmental agency] and Public Lands Management, to perform a further study with regard to the environmental aspects of the racetrack.... Finally, the Country must also take into account the interests of the project developer, who has made considerable investments based on the government concessions and temporary licenses, which cannot be canceled. The principle of legitimate expectations

requires, with reference to the disposition criterion, that these expectations cannot just be disappointed. (Def.Ex.146).

179. The Aruban legal principle of legitimate expectations requires that the GOA must compensate SMG and MAI for their losses, including lost profits, caused by the GOA's failure to fulfill the justified expectations which its promises and assurances created.

■■■ 180. The Court reaches the same conclusion with respect to Counts III and IV of MAI's and SMG's Second Amended Counterclaim. Both counts seek to hold the GOA liable for its bad faith conduct in the course of the racetrack project. Count III is based on the duty of good faith which the GOA and Mr. Sanchez's companies owed to each other as a result of their relationship as joint venturers. Count IV is based on the duty of good faith which the GOA and Mr. Sanchez' companies owed to each other as a result of the Letter of Intent. There is no dispute that these duties of good faith exist. Indeed, the GOA's Second Amended Complaint acknowledges the existence of these duties of good faith. The Court has already discussed at length the facts which support the GOA's breach of its precontractual duty of good faith under Aruban law. Those same facts support the conclusion that the GOA breached the duty of good faith which it owed to Mr. Sanchez and his companies pursuant to the Letter of Intent or as a result of their relationship as joint venturers.

181. MAI and SMG claim in Count II that the GOA made negligent misrepresentations about whether the GOA would provide a letter of comfort and whether the GOA would provide a guarantee for con-

struction financing. Significantly, Aruban tort liability in this regard is at least as broad, if not broader, than tort liability under Florida law. As recognized in the Agreed Statement of Issues of Law at ¶ 18, liability for negligent misrepresentation under Aruban law is governed by Article 1382 of the Aruban Civil Code, which provides that "each unlawful act, by which damage is inflicted on another person, renders the person whose fault has caused that damage liable to pay compensation therefor." The term "unlawful," as used in this provision, encompasses all conduct which is contrary to notions of proper conduct or is deemed unacceptable in social intercourse. As explicitly stated in Pretrial Stipulation ¶ 19 of the parties' Agreed Statement of Issues of Law:

> A constant line of cases, beginning in 1919, has interpreted the term "unlawful" in Article 1382 to encompass not only acts that violate statutes, but *any act or omission that is contrary to prevailing notions of proper conduct.* This *open-ended definition* has enabled Dutch and Aruban courts to impose liability in tort for conduct that, although not specifically addressed by statute, *is deemed unacceptable in social intercourse.*

Here, the GOA's misrepresentations, made time and again, that it would remain a shareholder in the Project, would issue a letter of comfort to stand behind Colorado Hills' obligations and would provide a guarantee to obtain construction financing for the Project, are "contrary to prevailing notions of proper conduct" and "deemed unacceptable in social intercourse," giving rise to liability in tort under Aruban law.

182. Having found the GOA liable under Counts II, III, IV and V of the Second Amended Counterclaim for breach of its duty of good faith, the Court concludes that there is no need to determine whether the GOA's promises and assurances to Mr. Sanchez and his companies rise to the level of contractual promises. Moreover, even if they did rise to the level of contractual promises, such contractual promises would not affect the GOA's liability under Counts II, III, IV and V. As recognized in Pretrial Stipulation ¶ 17 of the parties' Agreed Statement of Issues of Law, under Aruban law the existence of a contract does not bar a tort claim if the conduct is tortious regardless of the existence of the contract. Here, the Court has already determined that the GOA breached its duty of good faith whether or not the GOA's promises and assurances regarding its participation in the project rose to the level of contractual promises.

183. The Court has heard evidence at trial regarding the Aruban Accounting Ordinance and the GOA's claim that any promises it made was subject to the passage of appropriate state ordinances or other legislation. The Court concludes that the failure to pass any final state ordinance does not bar claims based on the GOA's breach of its duty of good faith. That is the precise situation which existed in *Trias,* discussed at length above. In that case, as here, the GOA made promises to the developer concerning financial support and other benefits it would provide for the project. In that case, as here, Parliament gave preliminary approval to the project. In that case, as here, no final state ordinance was passed by Parliament. Nevertheless, the Netherlands Supreme Court held that the GOA could be liable for breach of its duty of good faith. The same conclusion must be reached here. Indeed, in this case, the evidence shows that Parliament was ready and willing to

pass the appropriate state ordinance; however, the GOA, in bad faith, never submitted that state ordinance to Parliament for its consideration. Significantly, the testimony of Mr. Maduro, as well as the GOA's own submissions to the Aruban court in the environmental lawsuit, support the liability of the GOA in this regard.

184. The GOA submits that the "new" Aruban Accounting Ordinance as modifying this conclusion. First, in its memorandum in support of its previous memorandum of fact and law in support of its motion for summary judgment, filed in March 2002, the GOA conceded in footnote 13 that "[t]his amendment went into effect after the purported representations or promises were made." The GOA is bound by that concession. Second, Aruban law is to the contrary. The only decision presented to the Court on this issue is *Kock v. Land Aruba*, a decision dated December 17, 2001 and filed by Defendants/Counterplaintiffs on May 15, 2002 as part of their submission of Aruban law. In *Kock*, certain casino inspectors, who were GOA employees, claimed that they were terminated in bad faith. The GOA defended on the ground that the employment promises to these individuals from the Minister of Justice was unenforceable because that promise did not comply with the "new" Accounting Ordinance. As stated by the *Kock* Court, the GOA claimed that:

> The employment contracts are void pursuant to Article 23, first paragraph, of the Accounting Ordinance (hereafter: AO), because they were not concluded in writing, and also pursuance of Article 22, second paragraph, AO, because they were concluded for an indefinite period of time and, consequently, exceeding a period of five years.

and

> The former Minister of Justice did not have the power to incur expenses for payment of the casino inspectors without being authorized to do in the State Ordinance for the adoption of the budget for his Ministry for the financial year in question; this is in violation of Article 31, first paragraph, AO, so that pursuant to the second paragraph of that Article, these juristic acts only bind the aforementioned Minister personally. (Opinion at 6–7).

These are the precise claims made by the GOA in this case. The Court concluded that the "new" Accounting Ordinance did not automatically override the GOA's obligation of good faith. After discussing the issue extensively, the Court concluded:

> The above considerations, in conjunction with each other, lead to the judgment that the State cannot simply invoke the aforementioned provision of the AO (the Accounting Ordinance) under all circumstances without coming in conflict with good faith, which should be observed in judicial matters (also) by the State. It will depend in each separate case on the circumstances of the case to be deemed decisive in conjunction with each other, whether such an invocation by the State can be successful. (Opinion at 11–12).

The GOA has submitted no contrary authority. As a result, the "new" Accounting Ordinance does not change the GOA's obligation of good faith which it owed to Sanchez and his companies under well established Dutch law.

185. As detailed above, the GOA's breach of its duties of good faith during the "final stage" of negotiations, as that term is defined under Aruban and Dutch law, entitles MAI and SMG to recover damages, including the profits they would have earned on the racetrack project. The only limitation on such damages is that they must be caused by the breach and must also be foreseeable.

186. The Court has already addressed the issue of causation. The GOA's bad faith conduct, especially its April 28, 2000 "conditions," caused the project to fail.

187. On the issue of foreseeability, the Eleventh Circuit in *T.D.S., Inc. v. Shelby Mutual Ins. Co.,* 760 F.2d at 1532 n. 11, recognized that a party is not require to foresee the precise damages claimed as a condition to their recoverability. It is enough that the "actual consequences" "could have reasonably been expected to flow from the breach." *Id.* Indeed, as *Miller v. Allstate Ins. Co.,* 573 So.2d 24, 28–29 (Fla. 3d DCA 1990), cited by the GOA, makes clear, "damages are limited *to the types of loss* the breaching party had reason to anticipate at the time the contract was made." Here, the damages sought by MAI and SMG are the type of damages which the GOA could certainly foresee as flowing from its wrongful conduct. In fact, the GOA had within its possession the Colorado Hills Agreement, which detailed the moneys SMG and MAI would be entitled to receive for their work with respect to the Aruba Racetrack Project and the races to be run there.

188. Moreover, the Court rejects the argument that the damages sought by MAI and SMG are speculative. As recognized by the Florida Supreme Court:

> Uncertainty of the amount or difficulty of proving the amount of damage with certainty will not be permitted to prevent recovery on such contracts. If it is clear that substantial damages have been suffered, the impossibility of providing its precise limits is no reason for denying substantial damages altogether. [citations omitted].

> The uncertainty which defeats recovery in such cases has reference to the cause

of the damage rather than to the amount of it. If from the proximate estimates of witnesses a satisfactory conclusion can be reached, it is sufficient if there is such certainty as satisfies the mind of a prudent and impartial person. [citations omitted].

*Twyman v. Roell,* 123 Fla. 2, 166 So. 215, 218 (1936). The Florida Supreme Court reaffirmed *Twyman* in *W.W. Gay Mechanical Contractor, Inc. v. Wharfside Two, Ltd.,* 545 So.2d 1348 (Fla.1989). It rejected the argument that damages may be awarded only if there is some "track record" by which to gauge such damages. Instead, all that is required is that "[t]he party must provide that 1) the defendant's action caused the damage and 2) there is some standard by which the amount of damages may be adequately determined." 545 So.2d at 1351. *See also McCall v. Sherbill,* 68 So.2d 362, 364 (Fla.1953)("[D]amages are not rendered uncertain because they cannot be calculated with absolute exactness. It is sufficient that there be a reasonable basis of computation although the result may only be approximate.").

189. The Eleventh Circuit recognized the *Twyman* standard and applied it in *Electro Services, Inc. v. Exide Corp.,* 847 F.2d 1524 (11th Cir.1988). After quoting from *Twyman* at length, the court in *Electro Services* concluded: "As set forth above, Florida law clearly provides that inability to give the precise amount of damages does not preclude recovery when substantial damages were suffered." 847 F.2d at 1528. The Eleventh Circuit then considered the issue again in *Ad–Vantage Telephone Directory Consultants, Inc. v. GTE Directories Corp.,* 943 F.2d 1511 (11th Cir.1991). After quoting at length from *Electro Services,* it concluded that a

party "may offer proof of the extent of damages with evidence that is indirect and based on estimates and assumptions, 'so long as the assumptions rest on adequate data.'" 943 F.2d at 1518 (citations omitted).

190. As detailed in the Court's findings of fact, the evidence before this Court is sufficient to meet this standard.

191. Applying these standards, the Court concludes that Motorsports Americas, Inc. is entitled to recover $13,595,565 (see paragraphs 129 through 132 above) which represents the profits it would have earned on the Aruba Motorsports Project but for the misconduct of the Government of Aruba.

192. The Court further concludes that Sanchez Motorsports Group, Inc. is entitled to recover $6,917,061 (see paragraphs 129 through 132 above), which represents the profits it would have earned on the Aruba Motorsports Project but for the misconduct of the Government of Aruba.